PETER D. KEISLER
Assistant Attorney General

CARL J. NICHOLS
Deputy Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

JOSEPH H. HUNT
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Special Litigation Counsel

ANDREA GACKI
ANDREW H. TANNENBAUM
Trial Attorneys
U.S. Department of Justice, Civil Division

*Attorneys for the United States of America*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | | |
|---|---|---|
| AL-HARAMAIN ISLAMIC FOUNDATION, *et al.*, | ) ) ) | CV. 06-274-KI |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| GEORGE W. BUSH, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED STATES' ASSERTION OF THE MILITARY AND STATE SECRETS PRIVILEGE AND DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

<u>Page</u>

**(U)** INTRODUCTION ........................................................................... 1

**(U)** BACKGROUND ............................................................................ 6

    A.    **(U)** September 11, 2001 ....................................................... 6

    B.    **(U)** The Continuing Terrorist Threat Posed by al Qaeda ........... 8

    C.    **(U)** Intelligence Challenges After September 11, 2001 ........... 9

    D.    **(U)** NSA Activities Critical to Meeting Post-9/11 Intelligence Challenges ........... 9

    E.    **(U)** Plaintiffs' Allegations ................................................ 9

**(U)** ARGUMENT .............................................................................. 10

    I.    **(U)** THE STATE SECRETS PRIVILEGE BARS THE USE OF PRIVILEGED INFORMATION REGARDLESS OF A LITIGANT'S NEED ........... 10

        A.    **(U)** Procedural Requirements ........................................ 11

        B.    **(U)** Information Covered .............................................. 11

        C.    **(U)** Standard of Review ............................................... 12

    II.    **(U)** THE UNITED STATES PROPERLY HAS ASSERTED THE STATE SECRETS PRIVILEGE AND ITS CLAIM OF PRIVILEGE SHOULD BE UPHELD ........... 14

    III.    **(U)** THE UNITED STATES HAS DEMONSTRATED THAT A REASONABLE DANGER EXISTS THAT DISCLOSURE OF THE STATE SECRETS IMPLICATED BY PLAINTIFFS' CLAIMS WOULD HARM NATIONAL SECURITY ........... 15

        A.    **(U)** Disclosure of State Secrets Regarding the Al Qaeda Threat Would Harm National Security ........... 16

        B.    **(U)** Disclosure of Information That Would Confirm or Deny Whether Plaintiffs Have Been Targeted For Surveillance Would Harm National Security ........... 17

i

|  |  |  |  |
|---|---|---|---|
|  | D. | **(U)** Harm of Disclosing Information Related to the Sealed Document | 18 |
|  | E. | **(U)** Disclosure of State Secrets Regarding the Terrorist Surveillance Program Would Harm National Security | 19 |
| IV. |  | **(U)** BECAUSE ADJUDICATION OF PLAINTIFFS' CLAIMS REQUIRES THE DISCLOSURE OF STATE SECRETS, DISMISSAL IS REQUIRED | 19 |
|  | A. | **(U)** Plaintiffs Cannot Establish Standing to Maintain This Action | 20 |
|  | B. | **(U)** Whether the Alleged Surveillance Activities Are Properly Authorized by Law Cannot Be Resolved Without State Secrets | 25 |
|  | C. | **(U)** State Secrets Would Be Essential to Resolving Whether Any Alleged Surveillance of Plaintiffs Outside of the FISA Process Is Lawful Under Statutory Law and the Fourth Amendment | 30 |
| V. |  | **(U)** FURTHER LITIGATION WOULD RISK THE DISCLOSURE OF STATE SECRETS, WARRANTING DISMISSAL OF THIS ACTION | 35 |
| VI. |  | **(U)** STATUTORY PRIVILEGE CLAIMS HAVE ALSO BEEN PROPERLY RAISED IN THIS CASE | 38 |
| **(U)** CONCLUSION |  |  | 40 |

## (U) INTRODUCTION

(U) This lawsuit puts at issue a classified foreign intelligence program authorized by the President after September 11, 2001, to detect and prevent further terrorist attacks on the United States by al Qaeda and affiliated terrorist organizations. Plaintiffs, a designated terrorist entity and affiliated individuals, claim that their communications were unlawfully intercepted under this program. For the reasons set forth in more detail below, the very subject matter of this lawsuit—including whether any of the Plaintiffs was subject to such surveillance, and whether any such surveillance was lawful—implicates classified activities and information, the disclosure of which would be required or risked if Plaintiffs' claims were to be adjudicated. The United States therefore has moved to dismiss this action based on an assertion of the military and state secrets privilege (hereafter "state secrets privilege") by the Director of National Intelligence (DNI), John D. Negroponte, as well as the assertion of statutory privileges by Director Negroponte and Lieutenant General Keith B. Alexander, Director, National Security Agency (DIRNSA). *See* Public Declaration of John D. Negroponte; Public Declaration of Lt. Gen. Keith B. Alexander; *In Camera, Ex Parte* Classified Declaration of John D. Negroponte (lodged for the Court's review); *In Camera, Ex Parte* Classified Declaration of Lt. Gen. Keith B. Alexander (lodged for the Court's review).

(U) Plaintiffs in this action are the Al-Haramain Islamic Foundation of Oregon ("AHF-Oregon"), and two U.S. citizens, Wendell Belew and Asim Ghafoor, who state that they have "business and other relations with" AHF-Oregon. *See* Compl. ¶¶ 4-6. Plaintiffs aver that AHF-Oregon was affiliated with the Al-Haramain Foundation of Saudi Arabia ("AHF"), which Plaintiffs describe as a "charity" located in and controlled by individuals residing in that country. *Id.* ¶ 17. AHF-Oregon, in fact, was designated by the U.S. Department of Treasury in September

2004 as a "Specially Designated Global Terrorist" (SDGT) for having provided support to al Qaeda, Osama bin Laden, and other SDGTs, and was likewise listed by the United Nations Security Council as an entity belonging to or associated with al Qaeda.

(U) Plaintiffs allege that, in March and April of 2004, the National Security Agency ("NSA") engaged in electronic surveillance of communications between a director or directors of AHF-Oregon and Plaintiffs Belew and Ghafoor. *Id.* ¶¶ 4-6, 19. Plaintiffs allege that such surveillance was conducted without a court order authorizing such electronic surveillance; that the NSA did not otherwise follow the procedures mandated by the Foreign Intelligence Surveillance Act (FISA), 50 U.S.C. § 1801-62, *see id.* ¶¶ 2, 19, 27; and that the alleged surveillance exceeded the President's authority under Article II of the Constitution and violated, *inter alia,* Plaintiffs' Fourth Amendment rights. *See id.* ¶¶ 27, 29.

(U) Plaintiffs filed this lawsuit shortly after the President publicly stated in December 2005 that he had authorized the NSA to intercept certain communications for which there are reasonable grounds to believe that (1) the communication originated or terminated outside the United States, and (2) a party to such communication is a member of al Qaeda, a member of a group affiliated with al Qaeda, or an agent of al Qaeda or its affiliates. *See* Press Conference of President Bush (Dec. 19, 2005).[1] As the President has explained, the purpose of this program— known as the Terrorist Surveillance Program ("TSP")—is to protect the United States from another terrorist attack by the al Qaeda terrorist network.

(U) Because the Plaintiffs allege that they have been subject to warrantless surveillance, and because they specifically challenge the President's authority under Article II of the

---

[1]  (U) Available at http://www.white-house.gov//news/releases/2005/12/20051219-2.html.

PAGE 3 – DEFENDANTS' MEMORANDUM IN SUPPORT OF STATE SECRETS PRIVILEGE AND MOTION TO DISMISS

Constitution to authorize such surveillance, it is clear that the subject of the Plaintiffs' allegations is whether the TSP has been applied to them. But any effort to adjudicate whether any of the Plaintiffs were subject to such surveillance, and whether any such surveillance was lawful, would implicate state secrets that, in the judgment of the Director of National Intelligence and the Director of the National Security Agency, cannot be disclosed without causing great harm to national security.

(U) In sum, the law has long recognized a privilege for the protection of information vital to the Nation's security. *See United States v. Reynolds*, 345 U.S. 1 (1953); *see also Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998). Here, DNI Negroponte and NSA Director Alexander have formally asserted that privilege to protect certain intelligence information, activities, sources, and methods that are implicated by and would be necessary to adjudicate the merits of Plaintiffs' claims. In unclassified terms, the information subject to the assertion of privilege includes (i) information regarding the al Qaeda threat; (ii) information regarding the Terrorist Surveillance Program; and (iii) information that would confirm or deny whether Plaintiffs have been targeted for surveillance under the TSP or any other program—precisely the information that Plaintiffs now seek through their motion to compel. *See* Public and *In Camera* Negroponte Declarations and Public and *In Camera* Alexander Declarations.[2] In addition, the DNI has asserted privilege as to information concerning the sealed document before the Court. *See* Public Negroponte Decl. ¶¶ 11, 14, 15; and *In Camera* Negroponte Declaration.

(U) Once the privilege is properly invoked by the responsible agency head, as it has been

---

[2] **(U)** The classified declarations of John D. Negroponte, DNI, and Lt. Gen. Keith B. Alexander, DIRNSA, as well as the separately lodged memorandum for the Court's *in camera, ex parte* consideration, are currently stored in a proper secure location by the Department of Justice and are available for review by the Court upon request. *See* Notice of Lodging Classified Submissions for *In Camera, Ex Parte* Review.

here, the first question for the Court to consider is whether there is a reasonable danger that

national security would be harmed by the disclosure of state secrets. DNI Negroponte, supported

by General Alexander, demonstrates quite clearly that this is so and, under established authority,

the information at issue therefore must be excluded from disclosure and use in the case. *See*

*Kasza*, 133 F.3d at 1166. Once privileged information is excluded from the case, the Court then

must decide whether the case can proceed. If the absence of privileged information means either

that Plaintiffs cannot support their standing or their claims, or that Defendants cannot defend

against those claims, the case must be dismissed. *Id.* In addition, in cases where "sensitive

military secrets will be so central to the subject matter of the litigation that any attempt to

proceed will threaten disclosure of the privileged matters," dismissal is required. *See Fitzgerald*

*v. Penthouse Int'l, Ltd.,* 776 F.2d 1236 (4th Cir. 1985).

**(U)** Here, the "very subject matter" of this lawsuit is a state secret. *Reynolds,* 345 U.S. at

11 n.26. Plaintiffs allege that they have been the subjects of warrantless surveillance under a

classified foreign intelligence program. National security matters are not peripheral to this case;

the very *goal* of this lawsuit is to obtain a determination as to whether NSA has undertaken any

warrantless surveillance of Plaintiffs and, if so, whether that action was lawful—including

whether the President had authority to establish the program and whether its alleged application

to Plaintiffs violated their Constitutional rights. Litigating this matter will necessarily require,

and risk, the disclosure of state secrets.

**[REDACTED]**

**(U)** The United States does not lightly assert the state secrets privilege, nor does it seek to

utilize this privilege as a tactic to forestall judicial review of alleged unlawful activities. We are

confident that the Terrorist Surveillance Program authorized by the President is essential to

protect national security and well within the President's authority. But, as set forth further below, the facts necessary to demonstrate that this is so cannot be disclosed without that process causing grave harm to national security interests.

## (U) BACKGROUND

### A.    (U) September 11, 2001

(U) On September 11, 2001, the al Qaeda terrorist network launched a set of coordinated attacks along the East Coast of the United States. Four commercial jetliners, each carefully selected to be fully loaded with fuel for a transcontinental flight, were hijacked by al Qaeda operatives. Those operatives targeted the Nation's financial center in New York with two of the jetliners, which they deliberately flew into the Twin Towers of the World Trade Center. Al Qaeda targeted the headquarters of the Nation's Armed Forces, the Pentagon, with the third jetliner. Al Qaeda operatives were apparently headed toward Washington, D.C. with the fourth jetliner when passengers struggled with the hijackers and the plane crashed in Shanksville, Pennsylvania. The intended target of this fourth jetliner was most evidently the White House or the Capitol, strongly suggesting that al Qaeda's intended mission was to strike a decapitation blow to the Government of the United States—to kill the President, the Vice President, or Members of Congress. The attacks of September 11 resulted in approximately 3,000 deaths— the highest single-day death toll from hostile foreign attacks in the Nation's history. In addition, these attacks shut down air travel in the United States, disrupted the Nation's financial markets and Government operations, and caused billions of dollars of damage to the economy.

(U) On September 14, 2001, the President declared a national emergency "by reason of the terrorist attacks at the World Trade Center, New York, New York, and the Pentagon, and the continuing and immediate threat of further attacks on the United States." Proclamation No.

7463, 66 Fed. Reg. 48199 (Sept. 14, 2001). The United States also launched a massive military response, both at home and abroad. In the United States, combat air patrols were immediately established over major metropolitan areas and were maintained 24 hours a day until April 2002. The United States also immediately began plans for a military response directed at al Qaeda's training grounds and haven in Afghanistan. On September 14, 2001, both Houses of Congress passed a Joint Resolution authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" of September 11. Authorization for Use of Military Force, Pub. L. No. 107-40 § 21(a), 115 Stat. 224, 224 (Sept. 18, 2001) ("AUMF"). Congress also expressly acknowledged that the attacks rendered it "necessary and appropriate" for the United States to exercise its right "to protect United States citizens both at home and abroad," and acknowledged in particular that the "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." *Id.* pmbl.

(U) As the President made clear at the time, the attacks of September 11 "created a state of armed conflict." Military Order, § 1(a), 66 Fed. Reg. 57833, 57833 (Nov. 13, 2001). Indeed, shortly after the attacks, NATO took the unprecedented step of invoking article 5 of the North Atlantic Treaty, which provides that an "armed attack against one or more of [the parties] shall be considered an attack against them all." North Atlantic Treaty, Apr. 4, 1949, art. 5, 63 Stat. 2241, 2244, 34 U.N.T.S. 243, 246; *see also* Statement by NATO Secretary General Lord Robertson (Oct. 2, 2001), *available at* http://www.nato.int/docu/speech/2001/s011002a.htm ("[I]t has now been determined that the attack against the United States on 11 September was directed from abroad and shall therefore be regarded as an action covered by Article 5 of the Washington Treaty . . . ."). The President also determined that al Qaeda terrorists "possess both

the capability and the intention to undertake further terrorist attacks against the United States that, if not detected and prevented, will cause mass deaths, mass injuries, and massive destruction of property, and may place at risk the continuity of the operations of the United States Government," and he concluded that "an extraordinary emergency exists for national defense purposes." Military Order, § 1(c), (g), 66 Fed. Reg. at 57833-34.

### B.    (U) The Continuing Terrorist Threat Posed by al Qaeda

(U) With the attacks of September 11, al Qaeda demonstrated its ability to introduce agents into the United States undetected and to perpetrate devastating attacks. But, as the President has made clear, "[t]he terrorists want to strike America again, and they hope to inflict even more damage than they did on September the 11th." Press Conference of President Bush (Dec. 19, 2005).[3]  For this reason, as the President explained, finding al Qaeda sleeper agents in the United States remains one of the paramount national security concerns to this day. *See id.*

(U) Since the September 11 attacks, al Qaeda leaders have repeatedly promised to deliver another, even more devastating attack on America. For example, in October 2002, al Qaeda leader Ayman al-Zawahiri stated in a video addressing the "citizens of the United States": "I promise you that the Islamic youth are preparing for you what will fill your hearts with horror." In October 2003, Osama bin Laden stated in a released videotape that "We, God willing, will continue to fight you and will continue martyrdom operations inside and outside the United States . . . ." And again in a videotape released on October 24, 2004, bin Laden warned U.S. citizens of further attacks and asserted that "your security is in your own hands." In recent months, al Qaeda has reiterated its intent to inflict a catastrophic terrorist attack on the United

---

[3] (U) Available at http://www.white-house.gov//news/releases/2005/12/20051219-2.html.

States. On December 7, 2005, al-Zawahiri professed that al Qaeda "is spreading, growing, and becoming stronger," and that al Qaeda is "waging a great historic battle in Iraq, Afghanistan, Palestine, and even in the Crusaders' own homes." Finally, as is well known, since September 11, al Qaeda has staged several large-scale attacks around the world, including in Indonesia, Madrid, and London, killing hundreds of innocent people.

[REDACTED]

**C.      (U) Intelligence Challenges After September 11, 2001**

[REDACTED]

**D.      (U) NSA Activities Critical to Meeting Post-9/11 Intelligence Challenges.**

[REDACTED]

**E.      (U) Plaintiffs' Allegations**

(U) Against this backdrop, Plaintiffs allege that they have been subject to the very warrantless surveillance authorized by the President after the September 11 attacks, in violation of statutory law and Constitutional rights. Compl. ¶¶ 4-6, 19. Plaintiffs allege that the NSA did not obtain a court order authorizing such electronic surveillance under the FISA and, for that reason, the alleged surveillance violates that Act. *See* Compl. ¶¶ 2, 19, 27. Plaintiffs also claim that the alleged surveillance was authorized in excess of the President's authority under Article II of the Constitution. *See id.* ¶¶ 27, 29. Plaintiffs also challenge the alleged surveillance on other grounds, including that it violates the Fourth and First Amendments to the Constitution. *See id.* ¶¶ 31, 33. Plaintiffs further allege that information derived from the alleged unlawful intercepts was utilized by the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), during proceedings in which OFAC designated AHF-Oregon as a "Specially Designated Global Terrorist." *See id.* ¶¶ 20-22

(U) Plaintiffs seek a declaratory judgment that the alleged "warrantless surveillance of Plaintiffs is unlawful," and an injunction prohibiting "any such" warrantless surveillance. *See* Compl., Prayer for Relief, ¶ 1.[4]  Plaintiffs also seek an order requiring that any communications or documents related to the alleged unlawful surveillance be disclosed to them and destroyed by the government, *see id.*, Prayer for Relief , ¶¶ 2, 3, and further requiring OFAC to purge any information it acquired from the allegedly warrantless surveillance and to make no further use of such information, *see id.,* Prayer for Relief,  ¶ 4.  Plaintiffs also seek damages under the FISA, *see* 50 U.S.C. § 1810.  *See* Compl. ¶¶ 27 and Prayer for Relief , ¶¶ 5-6.

(U) These allegations, however, directly implicate classified activities and information that cannot be disclosed without causing exceptionally grave damage to the national security.

[REDACTED]

## (U) ARGUMENT

I. **(U) THE STATE SECRETS PRIVILEGE BARS THE USE OF PRIVILEGED INFORMATION REGARDLESS OF A LITIGANT'S NEED.**

(U) The ability of the executive to protect military or state secrets from disclosure has been recognized from the earliest days of the Republic. *See Totten v. United State*s, 92 U.S. 105 (1875); *United States v. Burr*, 25 F. Cas. 30 (C.C.D. Va. 1807); *Reynolds*, 345 U.S. at 6-7.  The privilege derives from the President's Article II powers to conduct foreign affairs and provide for

---

[4]  **(U)** In the "Introduction" to the Complaint, Plaintiffs claim that they seek an order that would require defendants "to halt an illegal and unconstitutional program of electronic surveillance of United States citizens and entities." *See* Compl. ¶ 1.  Defendants read Plaintiffs' Prayer for Relief as seeking declaratory and injunctive relief solely as to alleged "warrantless surveillance of plaintiffs." S*ee id.,* Prayer for Relief, ¶ 1.  Plaintiffs would obviously lack standing to obtain injunctive relief on behalf of other individuals not before the Court. *See, e.g., Califano v. Yamasaki*, 442 U.S. 682, 700-02 (1979); *Meinhold v. U.S. Dep't of Justice*, 34 F.3d 1469, 1480 (9th Cir. 1994) (injunction may be no broader than necessary to provide relief to the parties before the court); *see also Allen v. Wright*, 468 U.S, 737, 751 (1984); *Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976); *Warth v. Selden*, 422 U.S. 490, 499 (1975).

the national defense. *United States v. Nixon,* 418 U.S. 683, 710 (1974). Accordingly, it "must head the list" of evidentiary privileges. *Halkin v. Helms (Halkin I),* 598 F.2d 1, 7 (D.C. Cir. 1978).

### A.    (U) Procedural Requirements

(U) As a procedural matter, "[t]he privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party." *Reynolds,* 345 U.S. at 7; *see also Kasza,* 133 F.3d at 1165. "There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by the officer." *Reynolds,* 345 U.S. at 7-8 (footnotes omitted). Thus, the responsible agency head must personally consider the matter and formally assert the claim of privilege.

### B.    (U) Information Covered

(U) The state secrets privilege protects a broad range of state secrets, including information that would result in "impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign Governments." *Ellsberg v. Mitchell,* 709 F.2d 51, 57 (D.C. Cir. 1983), *cert. denied sub nom. Russo v. Mitchell, 4*65 U.S. 1038 (1984) (footnotes omitted); *accord Kasza,* 133 F.3d at 1166 ("[T]he Government may use the state secrets privilege to withhold a broad range of information;"); *see also Halkin v. Helms (Halkin II),* 690 F.2d 977, 990 (D.C. Cir. 1982) (state secrets privilege protects intelligence sources and methods involved in NSA surveillance). In addition, the privilege extends to protect information that, on its face, may appear innocuous but which in a larger context could reveal sensitive classified information. *Kasza,* 133 F.3d at 1166. "Accordingly, if seemingly innocuous information is part of a classified mosaic, the state secrets

privilege may be invoked to bar its disclosure and the court cannot order the Government to disentangle this information from other classified information." *Kasza*, 133 F.3d at 1166.

### C.    (U) Standard of Review

(U) An assertion of the state secrets privilege "must be accorded the 'utmost deference' and the court's review of the claim of privilege is narrow."[5] *Kasza*, 133 F.3d at 1166.  Aside from ensuring that the privilege has been properly invoked as a procedural matter, the sole determination for the court is whether, "under the particular circumstances of the case, 'there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged.'" *Kasza*, 133 F.3d at 1166 (quoting *Reynolds*, 345 U.S. at 10); *see also In re United States*, 872 F.2d 472, 475-76 (D.C. Cir. 1989); *Tilden v. Tenet*, 140 F. Supp. 2d 623, 626 (E.D. Va. 2000).

(U)  Thus, in assessing whether to uphold a claim of privilege, the court does not balance the respective needs of the parties for the information.  Rather, "[o]nce the privilege is properly invoked and the court is satisfied that there is a reasonable danger that national security would be harmed by the disclosure of state secrets, the privilege is absolute[.]" *Kasza*, 133 F.3d at 1166; *see also In re Under Seal,* 945 F.2d 1285, 1287 n.2 (4th Cir. 1991) (state secrets privilege "renders the information unavailable regardless of the other party's need in furtherance of the action"); *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 399 (D.C. Cir. 1984) (state secrets privilege "cannot be compromised by any showing of need on the part of the party

---

[5] **(U)** Indeed, the Supreme Court has made clear that the "authority to protect [national security] information falls on the President as head of the Executive Branch and as Commander in Chief" of the Nation's Armed Forces. *Department of the Navy v. Egan*, 484 U.S. 518, 527 (1988).  Thus, it is precisely because the privilege for "military or diplomatic secrets" is grounded in "areas of Art. II duties," which the Executive alone can exercise, that "courts have traditionally shown the utmost deference" to the Executive's discharge of these "Presidential responsibilities" regarding state secrets. *See United States v. Nixon*, 418 U.S. 683, 710-11 (1974) (discussing *Reynolds*, 345 U.S. 1, as illustrative example).

seeking the information"); *Ellsberg*, 709 F.2d at 57 ("When properly invoked, the state secrets privilege is absolute. No competing public or private interest can be advanced to compel disclosure of information found to be protected by a claim of privilege.").

(U) The absolute nature of the state secrets privilege applies to exclude the evidence regardless of the nature or significance of the claim at issue, including where constitutional claims are at stake. *See Halkin I*; *Halkin II* (state secrets protected in constitutional challenge to alleged unlawful surveillance); *Molerio v. FBI*, 749 F.2d 815 (D.C. Cir. 1984) (state secrets protected where First Amendment associational rights at issue); *Masri v. Tenet*, 2006 WL 1391390, at *3 (E.D. Va. May 12, 2006) (state secrets protected in constitutional tort challenge to alleged unlawful rendition by CIA). The court may consider the necessity of the information to the case only in connection with assessing the sufficiency of the Government's showing that there is a reasonable danger that disclosure of the information at issue would harm national security. "[T]he more plausible and substantial the Government's allegations of danger to national security, in the context of all the circumstances surrounding the case, the more deferential should be the judge's inquiry into the foundations and scope of the claim." *Ellsberg*, 709 F.2d at 59.

> Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake.

*Reynolds*, 345 U.S. at 11; *Kasza*, 133 F.3d at 1166.

(U) Judicial review of whether the claim of privilege has been properly asserted and supported does not require the submission of classified information to the court for in *camera, ex parte* review. In particular, where it is possible to satisfy the court, from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose state

secrets which, in the interest of national security, should not be divulged, "the occasion for the privilege is appropriate, and the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." *Reynolds*, 345 U.S. at 8. Indeed, one court has observed that in camera, ex parte review itself may not be "entirely safe."

> It is not to slight judges, lawyers or anyone else to suggest that any such disclosure carries with it serious risk that highly sensitive information may be compromised. In our own chambers, we are ill equipped to provide the kind of security highly sensitive information should have.

*Clift v. United States,* 597 F.2d 826, 829 (2d Cir. 1979) (*quoting Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1369 (4th Cir.), *cert. denied*, 421 U.S. 992 (1975)).

(U) Nonetheless, the submission of classified declarations for *in camera, ex parte* review is "unexceptional" in cases where the state secrets privilege is invoked. *Kasza*, 133 F.3d at 1169 (*citing Black v. United States*, 62 F.3d 1115 (8th Cir. 1995), *cert. denied*, 517 U.S. 1154 (1996)); *see Zuckerbraun v. General Dynamics Corp.*, 935 F.2d 544 (2d Cir. 1991); *Fitzgerald*, 776 F.2d 1236; *Molerio*, 749 F.2d at 822; *Farnsworth Cannon, Inc. v. Grimes,* 635 F.2d 268, 281 (4th Cir. 1980) (en banc); *see also, e.g., In re United States*, 872 F.2d at 474 (classified declaration of assistant director of the FBI's Intelligence Division submitted for in camera review in support of Attorney General's formal invocation of state secrets privilege).

## II.    (U) THE UNITED STATES PROPERLY HAS ASSERTED THE STATE SECRETS PRIVILEGE AND ITS CLAIM OF PRIVILEGE SHOULD BE UPHELD.

(U) It cannot be disputed that the United States properly has asserted the state secrets privilege in this case. The Director of National Intelligence, who bears statutory authority as head of the United States Intelligence Community to protect intelligence sources and methods, see 50 U.S.C. § 403-1(i)(l), has formally asserted the state secrets privilege after personal

consideration of the matter. *See Reynolds*, 345 U.S. at 7-8. DNI Negroponte has submitted an

unclassified declaration and an *in camera, ex parte* classified declaration, both of which state that

the disclosure of the intelligence information, sources, and methods described herein would

cause exceptionally grave harm to the national security of the United States. See Public and *In

Camera, Ex Parte* Declarations of John D. Negroponte, Director of National Intelligence. Based

on this assertion of privilege by the head of the United States Intelligence Community, the

Government's claim of privilege has been properly lodged.

## III.    (U) THE UNITED STATES HAS DEMONSTRATED THAT A REASONABLE DANGER EXISTS THAT DISCLOSURE OF THE STATE SECRETS IMPLICATED BY PLAINTIFFS' CLAIMS WOULD HARM NATIONAL SECURITY.

(U) The United States also has demonstrated that there is a reasonable danger that

disclosure of the information subject to the state secrets privilege would harm U.S. national

security. *Kasza,* 133 F.3d at 1166. While "the Government need not demonstrate that injury to

the national interest will inevitably result from disclosure," *Ellsberg*, 709 F.2d at 58, the showing

made here is more than reasonable; it is highly compelling.

(U) DNI Negroponte, supported by NSA Director Alexander, has asserted the state

secrets privilege and demonstrated the exceptional harm that would be caused to U.S. national

security interests by disclosure of information implicated by the Plaintiffs' allegations in the

Complaint. In unclassified terms, the information subject to the assertion of privilege includes

(i) information regarding the al Qaeda threat; (ii) information regarding the Terrorist

Surveillance Program; and (iii) information that would confirm or deny whether Plaintiffs have

been targeted for surveillance under the TSP or any other program—precisely the information

that Plaintiffs now seek through their motion to compel. *See* Public and *In Camera* Negroponte

Declarations and Public and *In Camera* Alexander Declarations. In addition, the DNI has

asserted privilege as to information concerning the sealed document before the Court. *See* Public

Negroponte Decl. ¶¶11, 14, 15; and *In Camera* Negroponte Declaration.

### A.   (U) Disclosure of State Secrets Regarding the Al Qaeda Threat Would Harm National Security.

**(U)** First, information concerning the nature and severity of the continuing al Qaeda

terrorist threat to the United States is at the foundation of this case and cannot be disclosed. The

continuing and urgent al Qaeda threat is the very reason the United States is undertaking the

intelligence activities implicated by this case. It is, therefore, essential background to a full

understanding of the compelling governmental interests at stake and the lawfulness of the TSP.

While the nature of this threat can be described to some extent on the public record, *see supra,*

the specific nature of the threat are compelling evidence as to the need for the Terrorist

Surveillance Program. Yet any disclosure of classified threat information would, of course,

disclose what the government may know about Al Qaeda's plans and how the government may

be obtaining information about them. Such a disclosure could not only lead al Qaeda to adjust its

activities to avoid detection, but would also tend to reveal to all adversaries possible sources and

methods of intelligence gathering—thereby compromising intelligence activities and causing

exceptionally grave damage to the national security.

**[REDACTED]**

**(U)** The nature of this continuing threat underscores both the compelling need for the

TSP and means it provides to detect the al Qaeda threat. The President has acted well within his

authority in utilizing the resources of the NSA in an armed conflict to defend the nation against

the threat of a renewed attack at the hands of an enemy that has already inflicted the single

deadliest foreign attack in the Nation's history. Further information about this threat cannot be

disclosed, however, and to decide whether the President acted within his power in establishing

the TSP, and whether the program is applied consistent with constitutional requirements, without a full understanding of the exigency of the circumstances at issue, would be to decide Plaintiffs' claims in a factual vacuum.

**B.    (U) Disclosure of Information That Would Confirm or Deny Whether Plaintiffs Have Been Targeted For Surveillance Would Harm National Security.**

(U) Plaintiffs also make allegations regarding whether they have been subject to surveillance by the NSA, *see* Complaint ¶¶ 2, 18-19, and specifically seek discovery regarding whether this is the case under *any* surveillance program. *See* Interrogatory Nos. 1-20. Plaintiffs also demand the production of any documents related to alleged surveillance of them. *See* Complaint, Prayer for Relief, ¶ 3. Regardless of whether these allegations are accurate or not, the United States can neither confirm nor deny who is or is not subject to surveillance. *See* Public Alexander Decl. ¶ 9; *see* Public Negroponte Decl. ¶ 13.

(U) The harm of revealing targets of foreign intelligence surveillance should be obvious. *See* Public Negroponte Decl. ¶ 13. If the government confirms that an individual is a target of surveillance, he would naturally tend to alter his behavior to take precautions against surveillance, thereby compromising valuable intelligence collection. *See id.* Also, disclosure of whether someone is subject to surveillance would tend to reveal the intelligence information, sources, and methods that are at issue in the surveillance, thus compromising that information, and those methods, and severely undermining surveillance activities in general. *See id.* Even confirming that individuals are *not* the target of surveillance would cause harm to the national security. *See id.* For example, if the NSA were to confirm in this case and others that specific individuals are not targets of surveillance, but later refuse to comment (as it would have to) in a case involving an actual target, a person could easily deduce by comparing such responses that

the person in the latter case is a target. *See id.* In addition, identifying who is not under surveillance would provide insight into the scope of government surveillance on a particular matter, alert such individuals that they may communicate freely if they do intend to act against U.S. interests, or identify someone who might be exploited, by force or unwittingly, to convey secure communications. *See id.* Thus, as a matter of course, the NSA cannot publicly confirm or deny whether *any* individual is subject to surveillance, because to do so would reveal or tend to reveal actual targets, sources, and methods. *See id.; see also* Public Alexander Decl. ¶ 9.

**[REDACTED]**

**D.    (U) Harm of Disclosing Information Related to the Sealed Document.**

**(U)** The Director of National Intelligence has also asserted a claim of privilege with respect to information contained in and pertaining to the sealed document filed in this case. *See* Public Negroponte Decl. ¶ 14. This Defendants have previously addressed this issue, on both the public and classified record in this case, in connection with the Oregoinian's motion to unseal the document. *See* Docket Nos. 24, 32, 38. The DNI has now asserted a state secrets and statutory privilege claim with respect to this matter as well, finding that the document remains properly classified, cannot be declassified, and that any further disclosure would cause exceptionally grave harm, notwithstanding the prior disclosure to the Plaintiffs. *See* Public Negroponte Decl. ¶ 14.[6]

**[REDACTED]**

---

[6] **(U)** It bears reiterating that the inadvertent disclosure of the document to Plaintiffs does not waive the document's classified status as a matter of law. *See* Defendants' Response to the Oregonian's Motion to Intervene and Unseal Records at 12-13.

**E.    (U)  Disclosure of State Secrets Regarding the Terrorist Surveillance
Program Would Harm National Security.**

(U) The Director of National Intelligence has also asserted a claim of privilege over

classified information concerning the Terrorist Surveillance Program, the program Plaintiffs

allege was applied to them without a warrant.  While the TSP is now a publicly acknowledged

program, information about the program remains classified and could not be disclosed in

adjudicating the Plaintiffs' claims without harming national security interests.  Indeed, in one

recent case, the district court noted the distinction between the known existence of a program,

and how it actually operates in a given case, in upholding a state secrets privilege claim.  *See El-

Masri v. Tenet*, 2006 WL 1391390, at *3 (E.D. Va. May 12, 2006).  In *El Masri*, the court

dismissed on state secrets grounds clams relating to an alleged unlawful "rendition" program,

noting that even where there might be "public affirmation of the existence of a" program, there is

a "critical distinction" between an admission that a program exists and the admission or denial of

the specific facts at issue. *See El-Masri,* 2006 WL 1391390, at *6.  "A general admission

provides no details as to the means and methods" involved in the program, and such "operational

details" are "validly claimed as state secrets." *Id.*  Likewise here, facts related to the TSP are

implicated by the Plaintiffs' claims but cannot be disclosed without that process itself causing

great harm to national security.

**[REDACTED]**

**IV.    (U) BECAUSE ADJUDICATION OF PLAINTIFFS' CLAIMS REQUIRES THE
DISCLOSURE OF STATE SECRETS, DISMISSAL IS REQUIRED.**

(U) Once a court has upheld a claim of the state secrets privilege, the evidence and

information identified in the privilege assertion is removed from the case, and the court must

undertake a separate inquiry to determine the consequences of this exclusion on further

proceedings. If the plaintiff cannot make out a prima facie case in support of its claims absent the excluded state secrets, the case must be dismissed. *See Kasza*, 133 F.3d at 1166; *Halkin II*, 690 F.2d at 998-99; *Fitzgerald*, 776 F.2d at 1240-41. And if the privilege "'deprives the *defendant* of information that would otherwise give the defendant a valid defense to the claim, then the court may grant summary judgment to the defendant.'" *Kasza*, 133 F.3d at 1166 (quoting *Bareford v. General Dynamics Corp.,* 973 F.2d 1138, 1141 (5th Cir. 1992) (emphasis in original)); *see also Zuckerbraun*, 935 F.2d at 547; *Molerio,* 749 F.2d at 825 (granting summary judgment where state secrets privilege precluded the Government from using a valid defense).

**(U)** As set forth below, beginning with the issue of Plaintiffs' standing, and extending to Plaintiffs' claims on the merits, state secrets are central to the resolution of this case.

A.    **(U) Plaintiffs Cannot Establish Standing to Maintain This Action.**

**(U)** Article III of the Constitution limits the role of federal courts to the resolution of cases and controversies. U.S. Const. art. III, § 2. An "essential and unchanging part" of that case-or-controversy requirement is the doctrine of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a plaintiff must, at an "irreducible constitutional minimum," demonstrate (1) an injury-in-fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. The party invoking federal jurisdiction bears the burden of establishing these elements and of coming forward with evidence of specific facts that prove standing. *See id.* at 561. A plaintiff must demonstrate a concrete and particularized injury that is actual or imminent, not speculative or hypothetical. *Id.* at 560. A particularized injury is one that directly affects a plaintiff "in a personal and individual way." *Id.* at 561 n.1; *see also Raines v. Byrd*, 521 U.S. 811, 819 (1997). Moreover, to obtain prospective relief, it is not enough that a

plaintiff may have suffered a past injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983);

*O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974). Instead, the plaintiff must show that he is

"immediately in danger of sustaining some direct injury" as the result of the challenged conduct.

*Lyons*, 461 U.S. at 102; *accord McConnell v. FEC*, 540 U.S. 93, 226 (2003); *Whitmore v.*

*Arkansas*, 495 U.S. 149, 158 (1990).

(U) As noted above, Plaintiffs allege that, in March and April of 2004, the NSA targeted,

and engaged in electronic surveillance of communications between, a director or directors of

AHF-Oregon and Plaintiffs Belew and Ghafoor without a obtaining a court order or following

procedures under FISA. Compl. ¶ 19. Before this Court can adjudicate Plaintiffs' claim that this

alleged warrantless surveillance was unlawful, however, Plaintiffs must be able to establish facts

that would demonstrate they have standing to obtain relief from the Court. This they cannot do.

The government cannot confirm or deny any alleged surveillance without disclosing state secrets

that would gravely harm national security, notwithstanding any evidentiary showing that

Plaintiffs think they can make based on the inadvertently disclosed document under seal.

(U) Courts in similar circumstances have recognized that facts tending to confirm or deny

whether particular individuals were subject to surveillance are properly protected as state secrets

and that, in the absence of such facts, such individuals cannot establish standing. In *Halkin I*, for

example, a number of individuals and organizations claimed that they were subject to unlawful

surveillance by the NSA and CIA (among other agencies) due to their opposition to the Vietnam

War. *See Halkin I*, 598 F.2d at 3. The very same question that was at issue in *Halkin I* is at issue

here: "should the NSA be ordered to disclose whether international communications of the

Plaintiffs have been acquired by NSA and disseminated to other federal agencies?" *Id.* at 4. The

D.C. Circuit answered that question in the negative, upholding an assertion of the state secrets

privilege regarding the identities of individuals subject to NSA surveillance, and rejecting the plaintiffs' argument that the privilege could not extend to the "mere fact of interception." *Id.* at 8. The court of appeals recognized that the "identification of the individuals or organizations whose communications have or have not been acquired presents a reasonable danger that state secrets would be revealed," and can be useful information "to a sophisticated intelligence analyst." *Id.* at 9. The court observed:

> A number of inferences flow from the confirmation or denial of acquisition of a particular individual's international communications. Obviously the individual himself and any foreign organizations with which he has communicated would know what circuits were used. Further, any foreign government or organization that has dealt with a plaintiff whose communications are known to have been acquired would at the very least be alerted that its communications might have been compromised or that it might itself be a target. If a foreign government or organization has communicated with a number of the plaintiffs in this action, identification of which plaintiffs' communications were and which were not acquired could provide valuable information as to what circuits were monitored and what methods of acquisition were employed. Disclosure of the identities of senders or recipients of acquired messages would enable foreign governments or organizations to extrapolate the focus and concerns of our nation's intelligence agencies.
>
> It requires little reflection to understand that the business of foreign intelligence gathering in this age of computer technology is more akin to the construction of a mosaic than it is to the management of a cloak and dagger affair. Thousands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate.

*Id.* at 8.

(U) Thus, the court in *Halkin I* firmly recognized the need to protect against the disclosure of information that would confirm or deny alleged surveillance, in part because it might tend to reveal other sensitive, classified information. Notably, the district court in *Halkin* had held that the claim of privilege could not preclude confirmation that a plaintiff's communications were acquired, because "so much information" about the program at issue had been disclosed on the public record. *Id.* at 10. Notwithstanding the public disclosures, however,

the court of appeals reversed the district court and upheld the claim of privilege, recognizing that "confirmation or denial that a particular plaintiff's communications have been acquired would disclose NSA capabilities and other valuable intelligence information." *Id.*

(U) A similar state secrets assertion was upheld in *Halkin II*, where privilege was asserted to protect information confirming or denying whether certain individuals had been subject to CIA surveillance. *See Halkin II*, 690 F.2d at 991. The court again rejected the notion that "the identities of the plaintiffs who were subject to surveillance" could be disclosed without harming national security. *Id.* at 993. The court observed that "it is clear that armed with this information" it might well be possible for the plaintiffs to adduce other intelligence sources and information. *See id.* at 993 n.57. And, once again, the Court rejected "the theory that because some information about the project ostensibly is now in the public domain, nothing about the project . . . can properly remain classified or otherwise privileged from disclosure." *Id.* at 994 (internal quotation marks omitted).

(U) For these reasons, the D.C. Circuit again held that the plaintiffs were incapable of demonstrating that they had standing to challenge the alleged surveillance. The court held that plaintiffs' "inability to adduce proof of actual acquisition of their communications now prevents them from stating a cognizable claim in the federal courts," and, in particular, that the plaintiffs' were "incapable of making the showing necessary to establish their standing to seek relief." *Id.* at 998.[7] The court thus found dismissal warranted because the plaintiffs' alleged injuries could be

---

[7] (U) *See also id.* at 999-1000 ("[T]he absence of proof of actual acquisition of appellants' communications is fatal" to their claims."); *id.* at 997 (quoting district court's ruling that "plaintiffs cannot show any injury from having their names submitted to NSA because NSA is prohibited from disclosing whether it acquired any of plaintiffs' communications"); *id.* at 990 ("Without access to the facts about the identities of particular plaintiffs who were subjected to CIA surveillance (or to NSA interception at the instance of the CIA), direct injury in fact to any of the plaintiffs would not have been susceptible of proof."); *id.* at 987 ("Without access to

no more than speculative in the absence of their ability to prove that their communications were intercepted. *Id.* at 999, 1001. Only those plaintiffs that the government officially conceded had been subject to surveillance were found to have demonstrated an injury in fact, *see id.* at 1003, but even these plaintiffs were precluded from seeking injunctive and declaratory relief because they could not demonstrate the likelihood of future injury or a live controversy in light of the fact that the CIA had terminated the specific intelligence methods at issue. *See id.* at 1005-09.[8]

(U) The same result is required here. The United States cannot confirm or deny whether Plaintiffs have been intercepted under the TSP without disclosing state secrets that would harm national security. As noted by the DNI and NSA Director, disclosure of whether someone is or is not subject to surveillance would tend to reveal intelligence information, sources, and methods. *See* Public Negroponte Decl. ¶ 13; Public Alexander Decl. ¶ 9. That is precisely the information that is necessary for Plaintiffs to establish their standing, and that the United States could not provide in discovery or in answering the Complaint.

**[REDACTED]**

(U) The government is not refusing to confirm surveillance here in order to avoid

---

documents identifying either the subjects of . . . surveillance or the types of surveillance used against particular plaintiffs, the likelihood of establishing injury in fact, causation by the defendants, violations of substantive constitutional provisions, or the quantum of damages was clearly minimal.").

[8] (U) Similarly, in *Ellsberg v. Mitchell*, a group of individuals filed suit after learning during the course of the "Pentagon Papers" criminal proceedings that one or more of them had been subject to warrantless electronic surveillance. Although two such wiretaps were admitted, the Attorney General asserted the state secrets privilege, refusing to disclose to the plaintiffs whether any other such surveillance occurred. *See* 709 F.2d at 53-54. As a result of the privilege assertion, the court upheld the district court's dismissal of the claims brought by the plaintiffs the Government had not admitted overhearing, because those plaintiffs could not prove actual injury. *See id.* at 65.

adjudication of the merits of Plaintiffs' claims; rather, the assertion of the privilege is necessary to protect information vital to national security. Without access to information, Plaintiffs' claims of actual interception are necessarily speculative and, in any event, cannot be adjudicated. *See Halkin II*, 690 F.2d at 1001 (holding that, in light of the government's state secrets assertion, "it can only be a matter of speculation" as to whether the individual plaintiffs were subject to NSA surveillance); and *id.* at 1003 n.96 ("claims asserted by plaintiffs whose very identifies must remain undisclosed are beyond the scope of the federal judicial power").

## B.    (U) Whether the Alleged Surveillance Activities Are Properly Authorized by Law Cannot Be Resolved Without State Secrets.

(U) Next, Plaintiffs raise two claims that put at issue whether the alleged surveillance activities were undertaken consistent with statutory requirements under the FISA and the President's authority under the Constitution. Plaintiffs first allege that any surveillance of conversations "between and among plaintiffs as targeted persons" without a court order violates the FISA. *See* Compl. ¶ 27 (First Claim for Relief). Separately, Plaintiffs allege that authorization of the program exceeds the *President's* authority. *See id.* ¶ 29 (Second Claim for Relief).

(U) These claims raise related but distinct issues. Whether the *President* had authority to authorize the Terrorist Surveillance Program is a distinct question from whether any alleged particular *application* of that program to the Plaintiffs was consistent with statutory law and the Constitution. Plaintiffs obviously do not have standing, based on their own alleged circumstances, to seek invalidation of the Terrorist Surveillance Program in all of its applications as authorized by the President. *See, e.g., Califano*, 442 U.S. at 700-02; *Allen*, 468 U.S, at 751; *Singleton*, 428 U.S. at 113-14; *Warth*, 422 U.S. at 499. Indeed, Plaintiffs could only seek, as they do, declaratory and injunctive relief solely as to any alleged surveillance of themselves. *See*

*Meinhold*, 34 F.3d at 1480; Complaint, Prayer for Relief, ¶ 1.

(U) In any event, it is clear that state secrets would be essential to resolving whether the President had the authority to authorize the Terrorist Surveillance Program, *see* Compl. ¶ 29, or whether any alleged surveillance of Plaintiffs under that program violated the law. The issue Plaintiffs seek to raise is one that quite obviously necessitates a clear and specific understanding of the surveillance being conducted pursuant to the President's authorization and the reasons the President authorized the surveillance. A host of considerations bear upon these questions, and all of them require a full understanding of the President's actions.

(U) First, it is well-established that the President's most basic constitutional duty is to protect the Nation from armed attack. As the Supreme Court has emphasized in the *Prize Cases*, the President is "bound to resist force by force"; he need not await any congressional sanction to defend the Nation from attack and "[h]e must determine what degree of force the crisis demands." *The Prize Cases,* 67 (2 Black) U.S. 635, 668, 670 (1863).[9]  In addition, the Authorization for Use of Military Force ("AUMF"), *supra*, granted the President broad discretion to deal with the al Qaeda threat in response to the 9/11 attacks. The President was specifically authorized to use "*all* necessary and appropriate force against those . . . organizations, or persons *he determines* planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001 in order to prevent any future acts of terrorism against the United States." AUMF § 2(a) (emphasis added). Congress also acknowledged in particular that "the President has authority under the Constitution to take action to deter and

---

[9] (U) *See also Hamilton v. Dillin*, 88 U.S. (21 Wall.) 73, 87 (1874) (The "President alone" is "constitutionally invested with the entire charge of hostile operations."); *United States v. Sweeny*, 157 U.S. 281, 284 (1895) ("[T]he object of the [Commander-in-Chief Clause] is evidently to vest in the President . . . such supreme and undivided command as would be necessary to the prosecution of a successful war.")

prevent acts of international terrorism against the United States." *Id.* pmbl.

(U) Second, it is also well-established that the President may exercise his statutory and constitutional authority to gather intelligence information about foreign enemies. *See, e.g., Totten v. United States*, 92 U.S. 105, 106 (1876) (recognizing President's authority to hire spies); *see also Chicago & S. Air Lines v. Waterman S.S. Corp.,* 333 U.S. 103, 111 (1948) ("The President, both as Commander in Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are not and ought not to be published to the world."); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (The President "has his confidential sources of information. He has his agents in the form of diplomatic, consular, and other officials.").[10] Wartime interception of international communications on public networks to identify enemy communications is a historical and necessary incident of warfare and within the authority of the Commander in Chief.[11]

(U)  Third, both before and after the enactment of the Foreign Intelligence Surveillance Act, every federal appellate court to address the issue has concluded that, even in peacetime, the President has inherent constitutional authority, consistent with the Fourth Amendment, to

---

[10]  (U) Congress itself has recognized the significance of these activities by enacting statutory protections on intelligence sources and methods. *See* Section V, *infra.*

[11]  (U) President Wilson, for example, relying on his constitutional powers and a congressional authorization for use of force, authorized the interception of all telephone, telegraph, and cable communications into and out of the United States during World War I. *See* Exec. Order 2604 (Apr. 28, 1917).  Similarly, President Roosevelt authorized the interception of "all . . . telecommunications traffic" into or out of the United States the day after the Pearl Harbor attack, December 8, 1941. *See* Memorandum for the Secretaries of War, Navy, State, and Treasury, the Postmaster General, and the Federal Communications Commission from Franklin D. Roosevelt (Dec. 8, 1941). *See* Jack A. Gottschalk, *"Consistent with Security" . . . . A History of American Military Press Censorship*, 5 Comm. & L 35, 39 (1983); *see also United States v. United States District Court,* 444 F.2d 651, 670 (6th Cir. 1971) (Appendix A) (reproducing memoranda of President's Roosevelt, Truman, and Johnson on foreign intelligence surveillance).

conduct searches for foreign intelligence purposes without securing a court order. *See In re Sealed Case,* 310 F.3d 717, 742 (Foreign Intel. Surv. Ct. of Rev. 2002) ("[A]ll the other courts to have decided the issue [have] held that the President did have inherent authority to conduct warrantless searches to obtain foreign intelligence information . . . . *We take for granted that the President does have that authority and, assuming that is so, FISA could not encroach on the President's constitutional power.*") (emphasis added); *accord, e.g., United States v. Truong Dinh Hung,* 629 F.2d 908 (4th Cir. 1980); *United States v. Butenko,* 494 F.2d 593 (3d Cir. 1974) (en banc); *United States v. Brown,* 484 F.2d 418 (5th Cir. 1973). *But cf. Zweibon v. Mitchell,* 516 F.2d 594 (D.C. Cir. 1975) (en banc) (dictum in plurality opinion suggesting that a warrant would be required even in a foreign intelligence investigation).[12]

(U) Thus, the claim Plaintiffs raise as to whether the President has acted within his constitutional and statutory authority in establishing the TSP to meet the al Qaeda threat present issues of the highest order that clearly turn on how the particular facts apply within the confines of the foregoing legal principles. And to decide the Presidential power issue would necessarily require the disclosure of classified details protected by the state secrets privilege.

(a)  (U) *The Continuing al Qaeda Threat*: As a threshold matter, it is impossible to decide the issue of the President's authority without understanding the severe threat to the Nation's security that the President must meet. The exigent nature of the threat and the various means being utilized by the enemy are compelling evidence as to the need for the Terrorist

---

[12] **(U)** Indeed, in enacting the Foreign Intelligence Surveillance Act, Congress understood that it was pressing or even exceeding constitutional limits in regulating the President's authority in the field of foreign intelligence. For example, the final House Conference includes the extraordinary acknowledgement that "[t]he conferees agree that the establishment by this act of exclusive means by which the President may conduct electronic surveillance does not foreclose a different decision by the Supreme Court." H.R. Conf. Rep. No. 95-1720, at 35, *reprinted in* 1978 U.S.C.C.A.N. 4048, 4062.

Surveillance Program as authorized by the President.  In light of the severe threat of further

mass-casualty attacks by a foreign power, the President's action to authorize the TSP falls

squarely within his Article II powers as Commander in Chief, as well as his authority under the

AUMF.

[REDACTED]

(U) The nature of this continuing threat underscores that the President, in authorizing the

TSP, was acting well within his authority in utilizing the resources of the NSA in an armed

conflict to defend the nation against the threat of a renewed attack at the hands of an enemy that

has already inflicted the single deadliest foreign attack in the Nation's history.

(b)  (U) *The Terrorist Surveillance Program*:  Second, to judge whether the President's

actions in this particular case fall within his inherent constitutional authority, as well as his

statutory authority under the AUMF, would require a specific explanation of how the TSP is

directed at the threat of an attack within the United States by a foreign enemy.  The classified

details of the TSP demonstrate that the President has ordered foreign intelligence surveillance of

a declared enemy of the United States in a time of a congressionally authorized armed conflict

against that enemy.  Those facts include the following:

[REDACTED]

(c)  (U) *The Foreign Intelligence Surveillance Act*:  Third, the President has determined

that the current threat to the United States demands that signals intelligence be carried out with a

speed and methodology that cannot be achieved by seeking judicial approval through the

traditional FISA process for the interception of individual communications.  This judgment is

well supported by the facts and falls within the President's authority, but evidence demonstrating

why this is so cannot be disclosed without causing grave harm to national security.

**[REDACTED]**

(U) The foregoing evidence would show that, in a wartime situation, in which swift and decisive action in collecting intelligence may spell the difference between a thwarted attack and another 3,000 or more deaths, the President's decision not to cede control over this vital intelligence collection effort to the potential delays and uncertainties of a judicial process is well-supported and consistent with the President's statutory and constitutional authority. "In cases like the present one, the significance of the constitutional questions involved cannot obviate the need for proceeding upon a 'full-bodied' record." *Halkin II*, 690 F.2d at 1000 n.81. Here, the most significant of the President's powers—his obligation to protect the Nation from foreign attack—is at issue. But a full defense of that authority would require an exposition of evidence that must remain protected for national security reasons.

C.    **(U)  State Secrets Would Be Essential to Resolving Whether Any Alleged Surveillance of Plaintiffs Outside of the FISA Process Is Lawful Under Statutory Law and the Fourth Amendment.**

(U) Aside from the broader issue of the President's authority to authorize the TSP, any effort to show that application of the TSP *to the Plaintiffs* in particular was lawful—that is, did not run afoul of FISA, *see* Compl. ¶ 27 (Second Claim for Relief), or the Fourth Amendment, *see id.* ¶ 31 (Third Claim for Relief), would obviously also require the disclosure of state secrets. First and foremost, adjudication of this claim would require confirming or denying NSA has "monitored conversations between and among plaintiffs as targeted persons" under the TSP without a warrant. For all the reasons noted above, confirming or denying those facts would reveal critical state secrets. But even assuming that the fact of surveillance of a particular could be confirmed, adjudicating whether that surveillance was lawful would depend on classified facts.

(U) As a general matter, the FISA requires that the Attorney General approve an application for an order from a special court composed of Article III judges—the Foreign Intelligence Surveillance Court. *See* 50 U.S.C. §§ 1804-1804. That application must demonstrate, among other things, that there is probable cause to believe that the target is a foreign power or agent of a foreign power. *See id.* § 1805(a)(3)(A). The Government must also certify that the information sought is foreign intelligence information that cannot be obtained by normal investigative means, and must state that the facilities at which the surveillance will be directed are being used, or about to be used, by a foreign power or agent of a foreign power. *See id.* §§ 1804(a)(7), 1804(a)(4), (a)(8).

(U) There is, however, substantial authority that particular searches undertaken specifically for foreign intelligence purposes are permissible without court orders. The Supreme Court has made clear that the requirement of a warrant supported by probable cause is not universal but turns on the particular circumstances at issue. The Court has repeatedly "reaffirm[ed] a longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989). In particular, the Court has held that the warrant requirement is inapplicable in situations involving "special needs" where the Government faces an increased need to be able to react swiftly and flexibly, or where interests in public safety beyond the interests in ordinary law enforcement are at stake. *See, e.g., Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 634 (1989); *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 653 (1995) (there are circumstances "'when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause

requirement impracticable'") (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 873 (1987).[13]

(U) In particular, the Supreme Court has specifically left open the issue of whether a warrantless search may be conducted for foreign intelligence purposes. *See United States v. United States District Court,* 407 U.S. 297 (1972) ("*Keith*") (Fourth Amendment's warrant requirement applies to investigations of wholly *domestic* threats to security—such as domestic political violence and other crimes). The Court in *Keith* noted that it was expressly reserving that question: "[T]he instant case requires no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers, within or without this country." *Id.* at 308; *see also id.* at 321-22 & n.20 ("We have not addressed, and express no opinion as to, the issues which may be involved with respect to activities of foreign powers or their agents.").[14]

(U) That *Keith* does not apply in the context of protecting against a foreign attack has

---

[13] **(U)** Indeed, as the Supreme Court just recently reaffirmed, "'[u]nder our general Fourth Amendment approach' we 'examin[e] the totality of circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." *Sampson v. California,* slip op., No. 04-9728 (June 19, 2006) (citing *United States v. Knights,* 534 U.S. 112, 118 (2001)). Whether a search is reasonable "'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.*

[14] **(U)** *Keith* made clear that one of the significant concerns driving the Court's conclusion in the domestic security context was the inevitable connection between perceived threats to domestic security and political dissent. As the Court explained: "Fourth Amendment protections become the more necessary when the targets of official surveillance may be those suspected of unorthodoxy in their political beliefs. The danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect 'domestic security.'" *Keith,* 407 U.S. at 314; *see also id.* at 320 ("Security surveillances are especially sensitive because of the inherent vagueness of the domestic security concept, the necessarily broad and continuing nature of intelligence gathering, and the temptation to utilize such surveillances to oversee political dissent."). Surveillance of domestic groups raises a First Amendment concern that generally is not present when the subjects of the surveillance are foreign powers or their agents.

been confirmed by the lower courts. After *Keith*, as noted above, each of the three courts of appeals that have squarely considered the question has concluded—expressly taking the Supreme Court's decision into account—that the President has inherent authority to conduct warrantless surveillance in the foreign intelligence context. *See, e.g., Truong Dinh Hung,* 629 F.2d at 913-14; *Butenko*, 494 F.2d at 603; *Brown*, 484 F.2d 425-26. As one court put it:

> [F]oreign intelligence gathering is a clandestine and highly unstructured activity, and the need for electronic surveillance often cannot be anticipated in advance. Certainly occasions arise when officers, acting under the President's authority, are seeking foreign intelligence information, where exigent circumstances would excuse a warrant. To demand that such officers be so sensitive to the nuances of complex situations that they must interrupt their activities and rush to the nearest available magistrate to seek a warrant would seriously fetter the Executive in the performance of his foreign affairs duties.

*Butenko*, 494 F.2d 605. As also noted, the Foreign Intelligence Surveillance Court of Review itself observed in dictum in 2002 that the President has inherent authority in this area. *See In re Sealed Case,* 310 F.3d at 742 ("[A]ll the other courts to have decided the issue [have] held that the President did have inherent authority to conduct warrantless searches to obtain foreign intelligence information . . . . *We take for granted that the President does have that authority and, assuming that is so, FISA could not encroach on the President's constitutional power*.") (emphasis added).

(**U**) All of the foregoing authority—which implicates whether the FISA applies to a search or the search may be conducted outside of warrant requirements for specific reasons—can only be judged on the facts of the particular circumstances at issue here, and doing so would clearly require the disclosure of state secrets.

### [REDACTED]

(**U**) Apart from whether alleged surveillance falls outside the warrant requirement, further analysis of any Fourth Amendment claim requires a fact-intensive inquiry regarding whether a

particular search satisfies the Fourth Amendment's "central requirement . . . of reasonableness." *McArthur*, 531 U.S. at 330; *see also Board of Educ. v. Earls,* 536 U.S. 822, 828 (2002). What is reasonable, of course, "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez,* 473 U.S. 531, 537 (1985). Thus, the permissibility of a particular practice "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate Governmental interests." *Delaware v. Prouse,* 440 U.S. 648, 654 (1979); *see also United States v. Knights*, 534 U.S. 112, 118-19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

**(U)** Indeed, in specifically addressing a Fourth Amendment challenge to warrantless electronic surveillance, the court in *Halkin II* observed that "the focus of the proceedings would necessarily be upon 'the "reasonableness" of the search and seizure in question.'" 690 F.2d at 1001 (quoting *Keith*, 407 U.S. at 308). But, as the court held, the "valid claim of the state secrets privilege makes consideration of that question impossible." *Id.* Without evidence of the detailed circumstances in which alleged surveillance activities were being conducted—that is, without "the essential information on which the legality of executive action (in foreign intelligence surveillance) turns"—the court in *Halkin II* held that "it would be inappropriate to resolve the extremely difficult and important fourth amendment issue presented." *Id.*[15] This holding fully applies here.

**(U)** Thus, even if it could be confirmed that the Plaintiffs were subject to surveillance,

---

[15] **(U)** *See also Halkin II*, 690 F.2d at 1000 ("Determining the reasonableness of warrantless foreign intelligence watchlisting under conditions of such informational poverty [due to the state secrets assertion] . . . would be tantamount to the issuance of an advisory opinion on the question.").

which it could not, any attempt to adjudicate the reasonableness of any particular search that might be at issue would again require a full exposition of the facts of the matter.

[REDACTED]

(U) One other factor in evaluating reasonableness of the searches being challenged is the efficacy of the means for addressing the problem. *See Vernonia*, 515 U.S. at 663; *see also Earls*, 536 U.S. at 834. In this regard as well, state secrets would be necessary to support the reasonableness of the NSA's actions but could not be disclosed.

[REDACTED]

(U) In sum, none of these substantial constitutional issues can be properly decided on the limited, incomplete public record of what has been disclosed about the Terrorist Surveillance Program. Any effort to determine the reasonableness of allegedly warrantless foreign intelligence activities under such conditions "would be tantamount to the issuance of an advisory opinion on the question." *Halkin II*, 690 F.2d at 1001 (citing *Chagnon v. Bell*, 642 F.2d 1248, 1263 (D.C. Cir. 1980)).[16]

## V.    (U) FURTHER LITIGATION WOULD RISK THE DISCLOSURE OF STATE SECRETS, WARRANTING DISMISSAL OF THIS ACTION.

(U) Finally, this case is a paradigmatic example of one that should be dismissed on state secrets grounds. If "the 'very subject matter of the action' is a state secret, then the court should dismiss the plaintiff's action based solely on the invocation of the state secrets privilege."

---

[16] **(U)** Adjudication of Plaintiffs' First and Sixth Amendment claims, *see* Compl. ¶¶ 33, 35, would similarly require classified facts covered by the state secrets assertion, including whether Plaintiffs' communications were actually intercepted and the specific factual circumstances of any interception. The same is also true for Plaintiffs' claim under Article 17 of the International Covenant on Civil and Political Rights, *see* Compl. ¶ 37, although Plaintiffs are not able to bring such a claim in any event absent a private right of action under the cited provision enforceable in this Court. *See, e.g., Igartua-De La Rosa v. United States*, 417 F.3d 145, 150 (1st Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1569 (2006); *Diggs v. Richardson*, 555 F.2d 848, 850 (D.C. Cir. 1976).

*Zuckerbraun*, 935 F.2d at 547 (citing *Reynolds,* 345 U.S. at 11 n.26); *see also Totten*, 92 U.S. at 107 ("[P]ublic policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated."). In such cases, "sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters." *Fitzgerald*, 776 F.2d at 1241-42; *see also, e.g., Tilden*, 140 F. Supp. 2d at 626; *Maxwell v. First National Bank of Maryland*, 143 F.R.D. 590, 598-99 (D. Md. 1992). Once again, the significance of the claim, including whether constitutional claims are at issue, is not relevant to whether a case should be dismissed in order to protect state secrets. *See Halkin I; Halkin II, supra* (constitutional challenge to alleged unlawful surveillance dismissed where protected state secrets precluded establishment of standing); *Molerio*, 749 F.2d at 815 (summary judgment entered for government where state secrets precluded adjudication of First Amendment claim); *El-Masri*, 2006 WL 1391390 (constitutional tort challenge to alleged unlawful rendition by CIA dismissed to protect state secrets); *Edmonds v. U.S. Department of Justice*, 323 F. Supp. 2d 65, 77-82 (D.D.C. 2004) (First and Fifth Amendment challenge to employment termination dismissed to protect state secrets), *aff'd*, 161 Fed. Appx. 6 (D.C. Cir.), *cert. denied*, 126 S. Ct. 734 (2005).

        **(U)** On its face, Plaintiffs' Complaint openly challenges the conduct of secret intelligence-gathering activities. The entire point of the lawsuit is to adjudicate the merits of those activities. By the very nature of the claims, Plaintiffs cannot establish facts to show their standing or make out a *prima facie* case on the merits, and the Defendants cannot defend their actions, without the disclosure of state secrets. This lawsuit is, thus, one in which state secrets are "so central to the subject matter of the litigation that any attempt to proceed will threaten

disclosure of the privileged matters." *Fitzgerald*, 776 F.2d at 1241-42.

(U) Any effort to "work around" classified facts as the case proceeds could tend to reveal and risk the disclosure of state secrets, particularly those crucial details that go to the ultimate issues in the case. "[B]its and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate." *Halkin* I, 598 F.2d at 8. For this reason, DNI Negroponte and Lt. General Alexander have both concluded that, given the subject matter of this case, further proceedings in this case would risk grave harm to national security interests. *See* Public Negroponte Decl. ¶ 3; Public Alexander Decl. ¶ 5.

(U) In this case, the clearest example of the potential risks involved has been Plaintiffs' own treatment of the sealed document. Notably, Plaintiffs' counsel recently attempted to summarize the document which, on its face, was marked classified, and which the Court *already required* to be secured in a highly classified Sensitive Compartmented Information Facility (SCIF). Plaintiffs' counsel subsequently filed this summary with the clerk's office, apparently on counsel's personal assumption that the summary did not have to be treated in accordance with the government's strict classification procedures. This chain of events demonstrates precisely the risk of disclosure resulting from the actions of counsel who have "every incentive to probe as close to the core secrets" as possible. *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 281 (4th Cir. 1980) (en banc).[17] Indeed, this episode helps demonstrate why courts routinely reject the idea of clearing counsel or entering protective orders in state secret cases and why such processes would be unacceptable in this case. *See Halkin I*, 598 F.2d at 7 ("Protective orders

---

[17] (U) Contrary to assertions by Plaintiffs' counsel, the government *in no way* approved this cavalier mishandling of a document that this Court had previously ordered be secured in a highly classified setting. On the contrary, when we saw what Plaintiffs' counsel had done, we insisted it be hand-delivered for *secure* transmission to the United States. This Court itself immediately detected Plaintiffs' error and within a few hours held a hearing to rectify the matter.

cannot prevent inadvertent disclosure nor reduce the damage to the security of the nation which may result."); *see also* Defs.' Mot. to Prevent Plaintiffs' Access to the Sealed Classified Document.

(U) The United States is mindful that the "denial of a forum provided under the Constitution for the resolution of disputes is a drastic remedy," *Fitzgerald v. Penthouse*, 776 F.2d at 1243. Nonetheless, "the state secrets doctrine finds the greater public good—ultimately the less harsh remedy—to be dismissal." *Bareford*, 973 F.2d at 1141; *Kasza*, 133 F.3d at 1167. Courts have found that this is the "result required" even where allegations of unlawful or unconstitutional actions are at issue. *See Halkin II*, 690 F.2d at 1001; *Maxwell*, 143 F.R.D. at 598 (successful invocation of the state secrets privilege and other statutory privileges "may defeat worthy claims"). The Plaintiffs' interests are not the only ones at stake, and the results would be harsh in either direction. Proceeding to litigate the subject matter of this dispute would cause grave harm of another kind—one that would potentially impact the security of all Americans. *See El Masri*, 2004 WL 1391390, at *7 (while dismissal of complaint deprives plaintiff of judicial forum, controlling legal principles require that "private interests must give way to the national interest in preserving state secrets").

(U) This is not to say there is no forum to air the weighty matters at issue, which remains a matter of considerable public interest and debate, but that the resolution of these issues must be left to the political branches of government.

## VI.    (U) STATUTORY PRIVILEGE CLAIMS HAVE ALSO BEEN PROPERLY RAISED IN THIS CASE.

(U) Two statutory protections also apply to the intelligence-related information, sources and methods described herein, and both have been properly invoked here as well. First, Section 6 of the National Security Agency Act of 1959, Pub. L. No. 86-36, § 6, 73 Stat. 63, 64, codified

at 50 U.S.C. § 402 note, provides:

> [N]othing in this Act or any other law . . . shall be construed to require the
> disclosure of the organization or any function of the National Security Agency,
> of any information with respect to the activities thereof, or of the names, titles,
> salaries, or number of persons employed by such agency.

*Id.* Section 6 reflects a "congressional judgment that in order to preserve national security,

information elucidating the subjects specified ought to be safe from forced exposure." *Founding

Church of Scientology of Washington, D.C., Inc. v. Nat'l Security Agency*, 610 F.2d 824, 828

(D.C. Cir. 1979); *accord Hayden v. Nat'l Security Agency*, 608 F.2d 1381, 1389 (D.C. Cir.

1979). In enacting Section 6, Congress was "fully aware of the 'unique and sensitive' activities

of the [NSA] which require 'extreme security measures.'" *Hayden*, 608 F.2d at 1390 (citing

legislative history). Thus, "[t]he protection afforded by section 6 is, by its very terms, absolute."

*Linder v. Nat'l Security Agency*, 94 F.3d 693, 698 (D.C. Cir. 1996).

   **(U)** The second applicable statute is Section 102A(i)(1) of the Intelligence Reform and

Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (Dec. 17, 2004), codified

at 50 U.S.C. § 403-1(i)(1). This statute requires the Director of National Intelligence to protect

intelligence sources and methods from unauthorized disclosure. The authority to protect

intelligence sources and methods from disclosure is rooted in the "practical necessities of

modern intelligence gathering," *Fitzgibbon v. CIA*, 911 F.2d 755, 761 (D.C. Cir. 1990), and has

been described by the Supreme Court as both "sweeping," *CIA* v. *Sims*, 471 U.S. 159, 169

(1985), and "wideranging." *Snepp v. United States*, 444 U.S. 507, 509 (1980). Sources and

methods constitute "the heart of all intelligence operations," *Sims*, 471 U.S. at 167, and "[i]t is

the responsibility of the [intelligence community], not that of the judiciary to weigh the variety

of complex and subtle factors in determining whether disclosure of information may lead to an

unacceptable risk of compromising the . . . intelligence-gathering process." *Id.* at 180.

(U) These statutory privileges have been properly asserted as to any intelligence-related information, sources and methods implicated by Plaintiffs' claims, and the information covered by these privilege claims is at least co-extensive with the assertion of the state secrets privilege by the DNI. *See* Public Declaration of John D. Negroponte, Director of National Intelligence, and Public Declaration of Lt. General Keith T. Alexander, Director, National Security Agency.

## (U) CONCLUSION

(U) For the foregoing reasons, the Court should:

1.      (U) Uphold the Government's assertion of the military and state secrets privilege and applicable statutory privileges and exclude from this case the information identified in the Declarations of John D. Negroponte, Director of National Intelligence of the United States, and Lt. Gen. Keith B. Alexander, Director, National Security Agency, and

2.      (U) Dismiss this action because adjudication of Plaintiffs' claims risks or requires the disclosure of protected state secrets and would thereby risk or cause exceptionally grave harm to the national security of the United States.

<div style="margin-left:40%">

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

CARL J. NICHOLS
Deputy Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

JOSEPH H. HUNT
Director, Federal Programs Branch

 *s/ Anthony J. Coppolino*
ANTHONY J. COPPOLINO
Special Litigation Counsel
tony.coppolino@usdoj.gov

</div>

*s/ Andrew H. Tannenbaum*
ANDREA GACKI
ANDREW H. TANNENBAUM
Trial Attorneys

U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20001
Phone: (202) 514-4782/(202) 514-4336/
(202) 514-4263
Fax: (202) 616-8460/(202) 616-8202

Attorneys for the United States of America

DATED: June 21, 2006