PETER D. KEISLER
Assistant Attorney General, Civil Division
CARL J. NICHOLS
Deputy Assistant Attorney General
JOSEPH H. HUNT
Director, Federal Programs Branch
ANTHONY J. COPPOLINO
Special Litigation Counsel
tony.coppolino@usdoj.gov
ANDREA GACKI
andrea.gacki@usdoj.gov
ANDREW H. TANNENBAUM
andrew.tannenbaum@usdoj.gov
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C.  20001
Phone: (202) 514-4782/(202) 514-4263/(202) 514-4336
Fax:    (202) 616-8460/(202) 616-8202/(202) 318-2461

*Attorneys for the United States of America*


# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| AL-HARAMAIN ISLAMIC FOUNDATION, *et al.*, | CV.  06-274- KI |
| Plaintiffs, | **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** |
| v. | |
| GEORGE W. BUSH, *et al.*, | |
| Defendants. | |

## (U)  TABLE OF CONTENTS

INTRODUCTION                                                                                    1

ARGUMENT                                                                                        3

I.       (U) PLAINTIFFS' STANDING AND CLAIMS CANNOT BE
         ADJUDICATED WITHOUT STATE SECRETS.                                                     3

         A.      (U) Plaintiffs' Standing Cannot Be Ascertained
                 Without State Secrets.                                                         3

         B.      (U) The Very Subject Matter of the Case Is a State Secret Because
                 the Proof Necessary to Adjudicate the Claims Are State Secrets.                5

         C.      (U) Adjudication of Plaintiffs' Claims on the Merits Do Not Involve
                 Pure Questions of Law but Fact Issues That Require or Risk the
                 Disclosure of State Secrets.                                                   9

         D.      (U) Security Concerns Cannot Be Alleviated by Segregating
                 Portions of the Sealed Document.                                              15

II.      (U) THE FOREIGN INTELLIGENCE SURVEILLANCE ACT DOES NOT
         SUPPLANT THE STATE SECRETS PRIVILEGE IN CASES INVOLVING
         ALLEGED UNLAWFUL SURVEILLANCE.                                                        17

         A.      (U) FISA Section 1806 is Inapplicable To This Case.                           17

         B.      (U) FISA Section 1806 Does Not Preempt the State
                 Secrets Privilege.                                                            20

                 1.      (U) The State Secrets Privilege Reflects the President's
                         Constitutional Authority over National Security and Foreign
                         Affairs, and Thus Is Constitutionally Based.                          20

                 2.      (U) Nothing in FISA Indicates Clear Congressional Intent
                         to Preempt the Constitutionally Based State Secrets Privilege.        22

III.     (U) *HAMDAN v. RUMSFELD* DOES NOT SUPPORT PLAINTIFFS'
         POSITION.                                                                             26

IV.      (U)  THE STATUTORY PRIVILEGES INVOKED IN THIS LITIGATION
         FURTHER PROTECT THE STATE SECRETS AT ISSUE IN THIS CASE.                              30

V.      (U) PLAINTIFFS' COUNSEL HAVE NO RIGHT OR ENTITLEMENT
        TO ACCESS CLASSIFIED INFORMATION IN THIS CASE.                31

CONCLUSION                                                            34

PETER D. KEISLER
Assistant Attorney General, Civil Division
CARL J. NICHOLS
Deputy Assistant Attorney General
JOSEPH H. HUNT
Director, Federal Programs Branch
ANTHONY J. COPPOLINO
Special Litigation Counsel
tony.coppolino@usdoj.gov
ANDREA GACKI
andrea.gacki@usdoj.gov
ANDREW H. TANNENBAUM
andrew.tannenbaum@usdoj.gov
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C.  20001
Phone: (202) 514-4782/(202) 514-4263/(202) 514-4336
Fax:    (202) 616-8460/(202) 616-8202/(202) 318-2461

*Attorneys for the United States of America*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| AL-HARAMAIN ISLAMIC FOUNDATION, *et al.*, | CV.  06-274- KI |
| Plaintiffs, | **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** |
| v. | |
| GEORGE W. BUSH, *et al.*, | |
| Defendants. | |

## INTRODUCTION

**(U)** Plaintiffs' opposition ("Pls. Opp.") to Defendants' Motion to Dismiss or for Summary Judgment ("Defs. Mem.") rests on a single assertion: that Plaintiffs "already know" they have been targeted under the Terrorist Surveillance Program ("TSP").  Plaintiffs contend that this is the only fact necessary to decide the merits of this case.  Plaintiffs belittle Defendants' position to the

contrary as "absurd" and "nonsense." Plaintiffs' posture is little more than an effort to induce the Government or the Court into confirming or denying information about Plaintiffs' allegations. Plaintiffs do not know what they do not know, and the law is clear that they may not use litigation to ascertain the truth or falsity of allegations concerning classified activities.

**(U)** The Government has set forth for the Court's review those state secrets that are implicated by this case, and why the proof needed to address Plaintiffs' claims implicates this information. In the face of this showing, the Court's initial task is to ascertain whether the Government has demonstrated that there is a reasonable danger that disclosure of the privileged information would harm national security and, if so, to exclude that information from the case. Defendants' showing of the harm to national security from any disclosure is well beyond merely reasonable; it demonstrates that grave harm would result from disclosure of the privileged information at issue here. That showing is entitled to great deference.

**(U)** The Court's next task is to assess whether the case can proceed without the privileged information. Whether the "very subject matter" of this case is a state secret turns not on whether certain facts about the allegations are public, but whether the *proof* needed to address the claims implicates state secrets. Again, Defendants have set forth specifically why this is so. Adjudication of Plaintiffs' claims would require not only confirming or denying allegations that they had been targeted by the alleged warrantless surveillance, but, even if such surveillance existed and could be disclosed, would also require setting forth the particular facts and circumstances surrounding any alleged surveillance in order to show that any such actions were properly authorized and did not violate statutory and constitutional law. These are inherently fact questions, not purely legal issues, and the facts needed to address the claims are not "already known" to Plaintiffs.

**(U)** Plaintiffs also contend incorrectly that, under Section 1806(f) of the Foreign Intelligence

Surveillance Act, they are entitled to discover evidence concerning the alleged surveillance. This statutory provision is not applicable here and in any event would not trump the constitutionally-based state secrets privilege.

(U) In addition, Plaintiffs' reliance on the recent Supreme Court decision in *Hamdan v. Rumsfeld*, __ U.S. __, 2006 WL 1764793 (June 29, 2006), is misplaced. The context of that case is clearly distinct from the present case, and *Hamdan* does not support Plaintiffs' position, let alone control the outcome here.

(U) Finally, Plaintiffs' demand for access to the classified submissions provided to this Court in support of the Government's state secrets assertion is specious. Long-established authority makes clear that Plaintiffs are not to be given access to any classified information submitted in support of the state secrets privilege. *See Reynolds v. United States*, 345 U.S. 1, 8 (1953) (courts must assess the privilege claim "without forcing a disclosure of the very thing the privilege is designed to protect"); *see also Halkin v. Helms*, 598 F.2d 1, 7 (D.C. Cir. 1978) ("It is not to slight judges, lawyers, or anyone else to suggest that any such disclosure carries with it the serious risk that highly sensitive information may be compromised"). Plaintiffs have presented no credible reason why the Government's state secrets privilege assertion should not be granted and why this case should not be dismissed.

## **ARGUMENT**

I.    **(U) PLAINTIFFS' STANDING AND CLAIMS CANNOT BE ADJUDICATED WITHOUT STATE SECRETS.**

A.    **(U) Plaintiffs' Standing Cannot Be Ascertained Without State Secrets.**

(U)    The central theme of Plaintiffs' opposition— that they "already know they have been

PAGE 3  –    DEFENDANTS' REPLY IN SUPPORT
OF MOTION TO DISMISS/SUMMARY JUDGMENT

targeted for surveillance," *see* Pls. Opp. at 10— cannot be credited.  Plaintiffs offer only conjecture

based on the sealed document and its impact here.  Notwithstanding what Plaintiffs think they know,

Defendants cannot address these very allegations without revealing information that would harm

national security.  Whatever Plaintiffs may believe the sealed document shows, the Government's

assertion of the state secrets privilege demonstrates the harm that would flow from the use of that

information in this case.  *See* Public Negroponte Decl. ¶ 14; *see also Chicago & Southern Air Lines,

Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948) ("The President, both as

Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence

services whose reports are not and ought not to be published to the world.").[1]

[**REDACTED TEXT**]

        **(U)** Accordingly, Plaintiffs' effort to distinguish identical challenges to alleged surveillance,

which were dismissed on state secrets grounds, is unavailing.  *See* Pls. Opp. at 21-25 (citing *Halkin

v. Helms* ("*Halkin I*"), 598 F.2d 1, 8-9 (D.C. Cir. 1978); *Halkin v. Helms* ("*Halkin II*"), 690 F.2d

977, 1001 (D.C. Cir. 1982)).  Any attempt by Defendants to engage Plaintiffs on this topic would

require confirming or denying matters that are and must remain classified, including facts that would

---

        [1] **(U)**    Plaintiffs persist in relying on *Doe v. Tenet*, 329 F.3d 1135 (9th Cir. 2003), *rev'd*,
544 U.S. 1 (2005), which was reversed by the Supreme Court.  *See* Pls. Opp. at 10.  In *Doe v.
Tenet*, the Ninth Circuit questioned the secrecy of a clandestine relationship, finding that it is
"widely known that the CIA contracts for spy services, and in particular that the CIA recruits
foreign spies."  *See Doe*, 329 F.3d at 1154, *rev'd*, 544 U.S. 1 (2005).  The Supreme Court
reversed on this point, finding that the alleged "secret espionage relationship" was indeed a
secret.  *See Tenet v. Doe*, 544 U.S. 1, 8 (2005).  In any event, the general fact that the
Government engages in intelligence activities does not warrant disclosing specific facts that
would either confirm or deny the allegations at issue concerning Plaintiffs.

PAGE 4  –    DEFENDANTS' REPLY IN SUPPORT
             OF MOTION TO DISMISS/SUMMARY JUDGMENT

address Plaintiffs' speculation one way or the other.[2]

**B.    (U) The Very Subject Matter of the Case Is a State Secret Because the Proof Necessary to Adjudicate the Claims Are State Secrets.**

**(U)** Beyond the issue of Plaintiffs' standing, Plaintiffs' assertion that "the entire American public" knows about the TSP, negating any possibility that the "very subject matter" of this suit is a state secret, *see* Pl. Opp. at 10, is wrong.[3]   Plaintiffs argue that "[b]ecause the warrantless surveillance program has received widespread publicity and has even been acknowledged by the President of the United States and other high-level government officials,  any claim that state secrets are at risk in litigation challenging the legality of the program is 'hard to fathom.'"  Pls. Opp. at 10 (quoting *Turkmen v. Ashcroft*, 2006 WL 1517743 (E.D.N.Y. May 30, 2006)).   This argument

---

[2]  **(U)** The recent district court decision in *Hepting, et al. v. AT&T Corp. et al.*, 2006 WL2038464 (N.D. Cal. July 20, 2006), does not support a finding that Plaintiffs here have standing.  *Hepting* involves a challenge brought against AT&T Corp. for allegedly assisting the National Security Agency in surveillance activities.  The district court declined to dismiss that action on state secrets grounds based on its view that public statements by the Government acknowledging the existence of the Terrorist Surveillance Program and other public statements by AT&T suggest that AT&T assists the Government in some manner.  *See id.* at *6-13.  With respect to the standing of the plaintiffs in that case, the court found allegations of a "dragnet" of surveillance would cover plaintiffs' communications and, thus, were sufficient to support plaintiffs' standing on the face of the complaint.  *See id.* at *18.  Defendants here do not challenge Plaintiffs' standing on the face of the complaint but, rather, demonstrate that standing cannot be *proven* due to state secrets.  Thus, while Defendants believe the *Hepting* decision is wrong (and the court has certified the order for appellate review), the court's determination as to standing there does not address the issue presented here as to whether state secrets would be necessary to adjudicate Plaintiffs' standing as a factual matter.

[3]  **(U)** While Plaintiffs make this point in the midst of discussing their standing, *see* Pls. Opp. at 10-11, the "very subject matter" inquiry goes to whether the claims can be adjudicated. Clearly, the "the entire American public" does not know details about the TSP sufficient to establish *Plaintiffs'* standing to challenge this program.  Whatever is known about the TSP in general, Plaintiffs must be able to establish its application to them personally—facts that, again, can neither be confirmed nor denied.

PAGE 5   –    DEFENDANTS' REPLY IN SUPPORT
OF MOTION TO DISMISS/SUMMARY JUDGMENT

fundamentally misapprehends the inquiry into whether the "very subject matter" of a lawsuit is a state secret. The question is not whether the lawsuit concerns a matter that is publicly known—such as the existence of the Terrorist Surveillance Program— but, whether the *proof* necessary to adjudicate the merits would inherently put at issue state secrets.[4/]

(U) *Fitzgerald v. Penthouse Int'l. Ltd.*, 776 F.2d 1236, 1237 (4th Cir. 1985), provides the best example. At issue there was an alleged libel that the plaintiff, who worked on a secret Navy program for training marine mammals, sought to use his expertise for personal profit. *See id.* at 1237. After determining that certain facts concerning the program were state secrets which must be protected, the Fourth Circuit went on to analyze whether the case could proceed. Even though the existence of the program at issue was publicly known, *see id.* at 1242-43 (public declaration of the Secretary of the Navy describing marine mammal program), classified aspects of how the program operated would have been inherently at issue in any adjudication of the alleged libel. The Fourth Circuit observed that, "due to the nature of the question presented in this action *and the proof required* by the parties to establish or refute the claim, the very subject of this litigation is itself a state secret." *Id.* at 1243 (emphasis added). The court held that the subject of the case was a state secret because "the parties' ability to prove the truth or falsity of the alleged libel" either risked or depended on the disclosure of state secrets. *Id.; see also id.* at 1241-42 ("[I]n some circumstances

---

[4] **(U)** The fact that the Department of Justice ("DOJ") issued a paper addressing the legal issues concerning the TSP in response to public interest, *see* Pls. Opp. at 14, in no way demonstrates that a claim for injunctive relief in federal court about the matter may proceed without implicating state secrets. The DOJ public memo itself makes clear that a full explanation of the need for the TSP could not be provided in an unclassified public document. *See* DOJ Memo at 1, 34 n. 18. http://www.usdoj.gov/opa/whitepaperonnsalegalauthorities.pdf.

sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters.").

**(U)** Similarly, in *El-Masri v. Tenet,* No. 1:05CV1417, 2006 WL 1391390 (E.D. Va. May 12, 2006), the court rejected an argument that the government's public affirmation of the existence of a program undercuts its assertion of privilege, recognizing that there is a "critical distinction" between a general admission that a program exists and the admission or denial of the specific facts at issue in the case. *See El-Masri*, 2006 WL 1391390 at *6. In deciding whether to dismiss the action, the court again looked beyond the existence of the program at issue to the facts that would necessarily have to be proven in order to challenge the lawfulness of the secret program. *Id.* at *7. This is the measure of whether the very subject matter of the case implicates state secrets. *See also Kasza v. Browner*, 133 F.3d 1159, 1169 (9th Cir.), *cert. denied*, 525 U.S. 967 (1998) ("very subject matter" of case was state secret because proof necessary for plaintiff to establish *prima facie* case and any further proceedings would jeopardize national security).[5/]

**(U)** Beyond this, the law is clear that public disclosure of some information about the subject of a case does not mean that adjudication of the claims do not inherently implicate state secrets.

---

[5]  **(U)** The district court in *Hepting* found that the very subject matter of that case was not a state secret based in part on the Government's public acknowledgment of the existence of the TSP and other public statements by AT&T. *See Hepting*, 2006 WL2038464 at * 11-13. Again, Defendants believe the *Hepting* court's assessment of that matter is wrong. In particular, the court there misapprehends the "very subject matter" inquiry as one that could be resolved by public statements when it concerns the actual proof needed to address the claims. In any event, even if the mere acknowledgment of the TSP were sufficient to infer that the subject matter at issue in *Hepting* could proceed—whether AT&T assisted the Government— a point the Government by no means concedes— the mere existence of the TSP is hardly sufficient to show that claims involving whether the Plaintiffs here were subject to surveillance can be adjudicated without implicating state secrets.

*See Fitzgerald,* 776 F.2d at 1242-43 (affirming dismissal despite published article on the matter and acknowledgment of marine mammal program); *Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1982) ("[B]are discussions by this court and the Congress of [the NSA's] methods generally cannot be equated with disclosure by the agency itself of its methods of information gathering").[6/]

**(U)** Plaintiffs' reliance on *Jabara v. Kelly*, 75 F.R.D. 475 (E.D. Mich. 1977), is particularly unfounded.  In that case, the court *upheld* an assertion of the state secrets privilege to bar discovery into whether the National Security Agency had intercepted the plaintiffs' communications.  *See id.* at 482 (privileged information concerns national security-related electronic surveillance of any conversation or communications to which the plaintiff was a party or in which activities of plaintiffs were discussed); *id.* at 492 (court is satisfied that disclosure of information related to interception of plaintiff's communications would compromise a highly valuable source of foreign intelligence with serious adverse consequences to the capability of the President to carry out his responsibilities).  The only fact that was unprotected in *Jabara* for future proceedings (which did not challenge NSA's alleged surveillance activities) was whether an *NSA* program was at issue in that case.  *See id.* at 493.  Here, there is no dispute that the TSP is an NSA activity.  What is in dispute is whether the Government can confirm or deny its application to Plaintiffs here— the very facts that were protected by the court in *Jabara.*[7/]

---

[6] **(U)** Even the district court in *Hepting*, which otherwise resolved the state secrets issue there incorrectly, noted that it should not rely on media reports in assessing whether the very subject matter of the case was a state secret.  *Hepting,* 2006 WL 203864 at * 10-11.

[7] **(U)** The *Turkmen* order cited by Plaintiffs is also inapposite.  *See Turkmen v. Ashcroft*, No. 02-CV-2307, 2006 WL 1517743 (E.D.N.Y. May 30, 2006).  The *Turkmen* litigation has

(continued...)

PAGE 8   –   DEFENDANTS' REPLY IN SUPPORT
            OF MOTION TO DISMISS/SUMMARY JUDGMENT

C.     (U) **Adjudication of Plaintiffs' Claims on the Merits Do Not Involve Pure Questions of Law but Fact Issues That Require or Risk the Disclosure of State Secrets.**

(U) Plaintiffs devote little space in their opposition to the central issue in this case: whether state secrets are necessary to resolve their claims.  *See* Pls. Opp. at 12-14.  Indeed, Plaintiffs fail to acknowledge that *any* facts are needed to address their claims.  *See* Defs. Mem. at 25-35.  Whether and to what extent their claims present fact issues requires looking ahead to assess how particular claims would be addressed on the merits.  Plaintiffs' theory that only pure questions of law are at issue is easily shown to be wrong.

(U) First, with respect to whether the President has authority to establish the TSP, the beginning and end of Plaintiffs' analysis is that the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §1804 *et seq.,* governs the matter definitively.  In a single sentence, without any analysis, Plaintiffs simply assert that the FISA "trumps" the President's authority.  In other words, Plaintiffs

---

[7](...continued)
nothing to do with the TSP or alleged intelligence activities, but rather concerns the conditions of confinement that existed in two detention facilities over four years ago.  Nonetheless, the plaintiffs in *Turkmen* sought discovery into whether their communications were monitored under the TSP.  In addition to objecting on relevancy grounds, the United States informed the magistrate judge that the government could not confirm or deny whether particular individuals were subject to surveillance without tending to reveal classified information.  Because the magistrate was attempting to design an alternative discovery approach that would satisfy the government's national security concerns, it was not necessary for the government to assert the state secrets privilege in that case.  The magistrate, however, decided ultimately to order the United States to disclose whether government attorneys or witnesses in the case were aware of monitoring of plaintiffs' attorney-client communications.  The government strongly disagrees with the decision, which is on appeal to the district court.  Notably, because it has not yet been necessary to assert the state secrets privilege in *Turkmen*, the magistrate judge's view was offered without the benefit of the kind of detailed showing presented to this Court as to the harm that confirming or denying surveillance would entail.

contend that FISA covers every possible circumstance in which the President wishes to direct foreign intelligence surveillance. Indeed, Plaintiffs' position does not even allow for the possibility that there are reasonable grounds to debate whether and to what extent the President and Congress share authority in this area, and where the line between their respective powers may be drawn.

**(U)** Far from being a settled proposition, courts and Congress itself have recognized that the President may authorize foreign intelligence surveillance. *See* Defs. Mem. at 25-28. To briefly reiterate, the President's most basic duty under the Constitution is to protect the nation from attack, *see, e.g., The Prize Cases,* 67 U.S. 635 (1862), and seeking to detect the presence and activities of a foreign enemy in the United States is well within the President's authority. *See* Defs. Mem. at 26-27 (citing *Chicago & Southern Air Lines,* 333 U.S. at 111; *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936)). Courts have also recognized the inherent authority of the President to conduct foreign intelligence surveillance. *See* Defs. Mem. at 27-28. Congress itself recognized that it was treading on Presidential authority in enacting the FISA. *Id.* at 28 n.12. Moreover, the Authorization for the Use of Military Force ("AUMF") granted the President broad power specifically to detect and stop al Qaeda attacks in the United States. *Id.* at 26; *see* Pub. L. No. 107-40 § 21(a), 115 Stat. 224, 224 (Sept. 18, 2001).

**(U)** Plaintiffs discuss none of these considerations; they simply assert that the FISA "trumps" them all. That proposition is unfounded. There is no doubt that the President has *some* authority concerning foreign intelligence surveillance, and the question presented in this case is whether the President acted within his own statutory and constitutional authority in establishing the TSP. Answering that question requires an assessment of what the President authorized and why—

including the exigent threat the President sought to address, the specific actions he authorized, the nature of the program, and why the normal FISA process would not be sufficient and would therefore intrude on the President's responsibility to protect the nation.  Such evidence does not merely go to the President's "motive" for acting, as Plaintiffs contend, *see* Pls. Opp. at 12.  Rather, facts concerning the reason the President acted and the manner in which he acted are essential to adjudicating the lawfulness of the program. As Defendants have demonstrated, however, this information cannot be disclosed without revealing to our adversaries vital intelligence information, sources, and methods.  Thus, even if Plaintiffs were subject to warrantless surveillance, and such a fact could be acknowledged, that fact alone would not be sufficient to resolve the claims on the merits.  *See Chicago & Southern Air Lines,* 333 U.S. at 111 ("It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret.")

**[REDACTED TEXT]**

**(U)** Likewise, Plaintiffs' Fourth Amendment claim, which puts at issue whether any alleged warrantless surveillance of Plaintiffs is reasonable, implicates state secrets.  Whether Plaintiffs were subject to the TSP, whether the nature of TSP surveillance may proceed without judicial authorization, and whether any searches undertaken under pursuant to the TSP were reasonable requires an exposition and assessment of what, if anything, actually occurred.  *See* Defs. Mem. at 30-35.  Plaintiffs do not even discuss how their Fourth Amendment claim would be resolved without facts.  Any warrant requirement embodied in the FISA is not a *per se* requirement, but turns on whether special needs require proceeding otherwise.  *See id.* at 31-32.  Again, this does not go to

"motive," as Plaintiffs contend, but to the evidence demonstrating that any surveillance, if it occurred, could lawfully proceed without a court order. Moreover, beyond the warrant requirement, the core Fourth Amendment issue is whether any search itself is reasonable, and this also necessarily depends on the foreign intelligence nature of the search, the need for it, and whether there was reasonable cause to proceed. *See id.* at 33-34 (citing *Halkin II* for the holding that Fourth Amendment challenge to alleged warrantless surveillance presents an inherently factual issue).

**(U)** Plaintiffs' observation that the Supreme Court in *United States v. United States District Court,* 407 U.S. 297 (1972) (the "*Keith*" case), did not delve into the details of how surveillance was conducted before holding that a warrant was required, is quite beside the point. The Supreme Court in *Keith* expressly reserved the issue as to the President's authority over foreign intelligence surveillance. *Id.* at 321-22. Following *Keith*, courts not only have acknowledged the President's constitutional role in this area, but have held that the particular circumstances of surveillance necessarily had to be assessed in deciding Fourth Amendment claims.

**(U)** In *United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980), for example, the Fourth Circuit observed that "the needs of the executive are so compelling in the area of foreign intelligence, unlike the area of domestic security, that a uniform warrant requirement would, following *Keith*, "unduly frustrate" the President in carrying out his foreign affairs responsibilities." *Id.* at 913. With respect to the warrant requirement, the Fourth Circuit found that "attempts to counter foreign threats to the national security require the utmost stealth, speed, and secrecy[,]" and, thus, that a warrant requirement would add a procedural hurdle that would reduce the flexibility of executive foreign intelligence initiatives, in some cases delay executive response to foreign

intelligence threats, and increase the chance of leaks regarding sensitive executive operations." *Id.*

(U) Similarly, the court in *United States v. Brown,* 484 F.2d 418, 426 (5th Cir. 1973), *cert. denied*, 415 U.S. 960 (1974), distinguished the teaching of *Keith* that "in the area of domestic security, the President may not authorize electronic surveillance without some form of prior judicial approval" from the President's inherent constitutional power to protect national security in the context of foreign affairs. *See id.* at 426. With respect to the warrant requirement, the court reaffirmed that the President may constitutionally authorize warrantless wiretaps for the purpose of gathering foreign intelligence. *See id.*

(U) The court in *United States v. Butenko,* 494 F.2d 593 (3d Cir.) (en banc), *cert. denied*, 419 U.S. 881 (1974), agreed with this view, stating that:

> [F]oreign intelligence gathering is a clandestine and highly unstructured activity, and the need for electronic surveillance often cannot be anticipated in advance. Certainly occasions arise when officers, acting under the President's authority, are seeking foreign intelligence information, where exigent circumstances would excuse a warrant.

*See* 494 F.2d at 605; *see also Truong*, 629 F.2d at 615 (where object of search is an agent of a foreign power, "the government has the greatest need for speed, stealth, and secrecy, and the surveillance in such cases is most likely to call into play difficult and subtle judgments about foreign and military affairs").

(U) Indeed, even in *Zweibon v. Mitchell*, 516 F.2d 594 (D.C. Cir. 1975) (en banc), *cert. denied*, 425 U.S. 944 (1976), in which a plurality suggested that the warrant requirement would apply even as to foreign intelligence gathering, the court specifically noted that the target at issue in that particular case was a *domestic* organization and stated that their conclusion as to the

President's powers might be different if a foreign power was targeted.  *See* 516 F.2d at 651 ("[W]e are only presented with a case in which foreign threats of retaliation against individual citizens abroad were provoked by the actions of the domestic organization which was subsequently wiretapped, rather than a case in which the wiretapped organization acted in collaboration with, or as the agent of, the foreign power from which the threat emanated.")

(U) Far from being purely legal, therefore, Plaintiffs' Fourth Amendment claim requires looking beyond the mere existence of FISA to facts demonstrating that the surveillance may be authorized by the President, including whether the actions taken are  foreign intelligence surveillance of agents of a foreign power, whether the circumstances at issue support that action without a warrant, and whether any particular searches at issue were supported by reasonable cause, *see*, *e.g.*, *Truong*, 620 F.2d at 915 (assessing facts to determine if foreign intelligence surveillance was at issue in Fourth Amendment challenge).

**[REDACTED TEXT]**

(U) Finally, Plaintiffs' separate discussion that this case presents an "adjudicatory" question and not a policy matter for Congress, *see* Pls. Opp. at 18-20, misses the point.  The law is clear that if state secrets are necessary to decide a case, as here, the case cannot proceed—that is, no "adjudication" is possible.  *Kasza*, 133 F.3d at 1167-68.  That this outcome may apply here would in no way mean that the "President may ignore" the law or, indeed, the judgment of a court, as Plaintiffs contend.  *See* Pls. Opp. at 19.  The law at issue includes the statutory and constitutional authority the President possesses with respect to foreign intelligence surveillance.  *See Truong*, 629 F.2d at 914 (Executive branch not only has superior expertise in the area of foreign intelligence, it

is also constitutionally designated as the pre-eminent authority in foreign affairs) (citing *First National Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 765-68 (1972); *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918)).  The law also finds that the "greater public good" is the avoidance of risking the disclosure of state secrets.  *See Kasza*, 133 F.3d at 1167.  Moreover, as one court observed, the structure of the FISA "demonstrates that the *political branches* need great flexibility to reach the compromises and formulate the standards which will govern foreign intelligence surveillance," and, thus, that it would be unwise for the judiciary to attempt to enunciate "an equally elaborate structure for core foreign intelligence surveillance under the guise of a constitutional decision." *Truong*, 620 F.2d at 915 n.4 (emphasis added).  Accordingly, while dismissal is required here to protect state secrets, this will not result in important policies going unexamined by the political branches.  *See* Defs. Mem. at 35-38.

## D.    (U) Security Concerns Cannot Be Alleviated by Segregating Portions of the Sealed Document.

**(U)** Faced with compelling arguments that any attempt to litigate this case would cause exceptionally grave damage to the national security, Plaintiffs purport to offer a compromise of sorts:  only limited portions of the sealed document, which allegedly show that Plaintiffs were subject to surveillance need to be disclosed.  *See* Pls. Opp. at 15.  Plaintiffs assert that this identified use of the document "does not put national security at risk," because, in their view, the document is otherwise "innocuous."  *See id.*

**(U)** Plaintiffs simply are not in a position to know whether the document is truly innocuous or not and, in any event, their proposal is no compromise.  Plaintiffs do not seek to "disentangle" non-privileged information, *see* Pls. Opp. at 15, but, rather, would have Defendants disclose

PAGE 15  –    DEFENDANTS' REPLY IN SUPPORT
                OF MOTION TO DISMISS/SUMMARY JUDGMENT

information subject to the state secrets assertion by the Director of National Intelligence, including

by confirming or denying whether Plaintiffs have been targeted for surveillance, solely on the

ground that Plaintiffs believe such information should not be protected.  The Director of National

Intelligence has stated that disclosure of the information reflected in this document would cause

exceptionally grave harm to national security.  *See, e.g.*, Public Negroponte Decl. ¶¶ 11, 14.  Unlike

the DNI, Plaintiffs lack a "broader understanding of what may expose classified information and

confidential sources," *see Snepp v. United States*, 444 U.S. 507, 512 (1980), and in any event have

their own private interests as litigants.

> The significance of one item of information may frequently depend
> upon knowledge of many other items of information.  What may
> seem trivial to the uninformed, may appear of great moment to one
> who has a broad view of the scene and may put the questioned item
> of information in its proper context.

*United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir.), *cert. denied*, 409 U.S. 1063 (1972); *see*

*also Kasza*, 133 F.3d at 1166 (holding that "if seemingly innocuous information is part of a

classified mosaic, the state secrets privilege may be invoked to bar its disclosure and the court

cannot order the government to disentangle this information from other classified information").

Intelligence assessments are, moreover, "delicate, complex, and involve large elements of

prophecy[,]" and "[t]hey are and should be undertaken only by those directly responsible to the

people whose welfare they advance or imperil." *Chicago & Southern Air Lines*, 333 U.S. at 111.

This is not a matter where the "mosaic" theory of protecting information that might reveal a larger

picture of classified activity is "being abused," as Plaintiffs contend, *see* Pl. Opps. at 16-17.[8]

Plaintiffs lack any foundation for such a statement or the proposal they make.

## II.    (U) THE FOREIGN INTELLIGENCE SURVEILLANCE ACT DOES NOT SUPPLANT THE STATE SECRETS PRIVILEGE IN CASES INVOLVING ALLEGED UNLAWFUL SURVEILLANCE.

(U) Next, in order to obtain discovery and an adjudication of the lawfulness of alleged surveillance against them, Plaintiffs advance several arguments that no court has credited—that the judicial review procedures of FISA permit discovery to establish or confirm the existence of surveillance; that the state secrets privilege has no constitutional basis; and that Congress overrode the privilege in enacting FISA. These arguments betray a fundamental misreading of FISA and a basic misunderstanding of the state secrets privilege.

### A.    (U) FISA Section 1806 is Inapplicable To This Case.

(U) Plaintiffs' claim that FISA, in particular Section 1806(f), is applicable to this case is without merit. As the United States previously explained,[9] this provision was enacted for the benefit

---

8  **(U)** *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002), is inapposite. That case does not concern the state secrets privilege, but whether the First Amendment requires that deportation proceedings be open. The Sixth Circuit rejected what it found was an "over-inclusive" closure order that did not take into account the need to protect particular information. *See id.* at 707-710 (directive at issue categorically closes all hearings at issue). But the Sixth Circuit agreed that the Government had a compelling interest in protecting information that might be of interest to terrorist groups— indeed, it "deferred" to the Government's judgment on that issue. *See* 303 F.3d at 706. It also made clear that the Government could keep confidential pertinent information as the need arises. *See id.* at 709. Here, the Government is protecting specific facts where the need has arisen, and the situation in *Detroit Free Press* is not comparable.

9  **(U)** *See* Reply in Support of Defendants' Motion to Prevent Plaintiffs' Access to the Sealed Classified Document, at 14-18.

PAGE 17    –    DEFENDANTS' REPLY IN SUPPORT
                    OF MOTION TO DISMISS/SUMMARY JUDGMENT

of the Government, and it is procedural in nature.  It authorizes district courts, at the request of the Government, to protect classified information through *in camera*, *ex parte* review when a person has demanded discovery of FISA applications, orders, or related materials, or moves to suppress FISA-obtained or -derived information.

**(U)** As opposed to Plaintiffs' allegations here, the procedures set forth in Section 1806(f) generally apply where the Government intends to use the fruits of FISA surveillance "against" an "aggrieved person."  *See* 50 U.S.C. § 1806(c), (e) & (f).  The statute itself, and caselaw construing this section, make clear, however, that an "aggrieved person" is someone as to whom FISA surveillance has been made known, typically in a criminal proceeding, *see, e.g., United States v. Ott*, 827 F.2d 473, 474 (1987), and is a mechanism for dealing with motions to suppress or discovery demands related to that acknowledged surveillance.  It is not a means to discover whether surveillance has occurred in the first place, as Plaintiffs are attempting to do here.  *See ACLU Foundation v. Barr*, 952 F.2d 457, 468-69 & n.13 (D.C. Cir. 1991) ("The government makes this point, with which we agree, that under FISA it has no duty to reveal ongoing foreign intelligence surveillance.") (citing S. Rep. 95-604, Pt. 1, 95th Cong., 1st Sess., at 59 (1977), *reprinted in* 1978 U.S.C.C.A.N. 3904, 3960-61); *In re Grand Jury Investigation*, 431 F. Supp. 2d 584, 591-92 (E.D. Va. 2006) (finding that, in grand jury proceedings, neither the non-target witness nor the potential target was entitled to notice under the FISA of whether there was any warrantless NSA electronic surveillance of the potential target).

 **(U)** Section 1806(f)'s applicability to these circumstances is confirmed by its very terms, which apply in three contexts: *first*, when a governmental entity gives notice under Section 1806(c)

or (d) that it intends to use evidence obtained or derived from FISA surveillance against the aggrieved person; *second*, when the aggrieved person seeks to suppress that evidence under Section 1806(e); and *third*, when the aggrieved person moves or requests "to discover or obtain FISA applications, orders or other materials" related to the surveillance or the evidence or information derived from the surveillance.  *See* 50 U.S.C. § 1806(f); *cf. id.* § 1804(a) (FISA applications); *id.* § 1805 (orders); *id.* § 1804(c), (d) (discussing other materials related to surveillance).

(U) Section 1806(f) thus is an affirmative grant of authority that requires the district court to conduct an *in camera, ex parte* review at the request of the Attorney General, but such review occurs in those limited circumstances in which Section 1806(f) applies.  *See, e.g.*, *United States v. Hammoud*, 381 F.3d 316, 331-32 (4th Cir. 2004), *reaffirmed*, 405 F.3d 1034 (4th Cir. 2005) (criminal defendant moved to suppress recorded telephone conversions that were obtained through a FISA wiretap under section 1806(f); court, after an *in camera, ex parte*, denied the motion to suppress); *United States v. Squillacote*, 221 F.3d 542, 552, 553-54 (4th Cir. 2000), *cert. denied*, 532 U.S. 971 (2001) (criminal defendant sought to suppress the fruits of the FISA surveillance; court reviewed FISA material *in camera* and *ex parte* and denied defendant's request); *United States v. Johnson*, 952 F.2d 565, 571-73 (1st Cir.) (upholding legality of FISA surveillance used against defendants at trial), *cert. denied*, 506 U.S. 816 (1992).[10]

(U)  In this case, the very threshold question of whether or not Plaintiffs have been subject to surveillance is a state secret, *see* Public Negroponte Decl. ¶ 11(iii), and Plaintiffs cannot use FISA

---

[10] (U) Thus, Plaintiffs are wrong that the availability of the state secrets privilege in cases like this one nullifies Section 1806(f) of FISA, *see* Pls. Opp. at 8, since that provision is obviously used to challenge surveillance in other contexts.

to attempt to confirm their belief that they have been subject to surveillance.  *See ACLU Foundation*

*v. Barr*, 952 F.2d at 468-69 & n.13.[11/]

      **B.     (U) FISA Section 1806 Does Not Preempt the State Secrets Privilege.**

           **1.     (U) The State Secrets Privilege Reflects the President's Constitutional Authority over National Security and Foreign Affairs, and Thus Is Constitutionally Based.**

**(U)** Plaintiffs' contention that FISA preempts an assertion of the state secrets privilege in

alleged electronic surveillance cases is baseless.  This argument presumes, first, that the privilege

is only a common law evidentiary privilege with no constitutional basis.  *See* Pls. Opp. at 4 n. 2, 7.

That is clearly wrong.  Plaintiffs simply fail to recognize that common law privileges can also be

rooted in the Constitution.  *See, e.g.*, *United States v. Hubbell*, 530 U.S. 27, 51-53 (2000) (Thomas,

J., concurring).

**(U)** The Supreme Court has made clear that the "authority to protect [national security]

information falls on the President as head of the Executive Branch and as Commander in Chief" of

the Nation's Armed Forces.  *See Department of the Navy v. Egan*, 484 U.S. 518, 527 (1988).

Indeed, the Court has specifically emphasized that the Executive's authority to "control access to

information bearing on national security" "exists quite apart from any explicit congressional grant"

of power, because it flows primarily from the "constitutional investment of power in the President"

---

[11] *See* S. Rep. 95-604, Pt. 1, 95th Cong., 1st Sess. 1977, at 57, *reprinted in* 1978 U.S.C.C.A.N. 3904, 3958 ("The special procedures in [section 1806(f)] cannot be invoked until they are triggered by a government affidavit that disclosure or an adversary hearing would harm the national security of the United States."); *see also United States v. Ott*, 827 F.2d 473, 477 (9th Cir. 1987) ("Congress has a legitimate interest in authorizing the Attorney General to invoke procedures designed to ensure that sensitive security information is not unnecessarily disseminated to *anyone* not involved in the surveillance operation in question . . . .").

PAGE 20  –    DEFENDANTS' REPLY IN SUPPORT
                    OF MOTION TO DISMISS/SUMMARY JUDGMENT

found in Article II of the Constitution.  *Id.*; *see also* U.S. Const., Art. II, § 1 ("The executive power shall be vested in [the] President"); *id.* § 2 ("The President shall be Commander in Chief of the Army and Navy of the United States").

**(U)** The authority to invoke the state secrets privilege to protect national security information from disclosure in judicial proceedings is merely one aspect of the Executive's broader Article II power to control the dissemination of such highly sensitive information.  The Supreme Court in *United States v. Nixon*, 418 U.S. 683, 710 (1974), contrasted the general privilege for Presidential communications "inextricably rooted in the separation of powers" with the Executive's more focused constitutional privilege "to protect military, diplomatic, or national security secrets," and concluded that the general Executive privilege does not enjoy the same legal standing as the state secrets privilege.  *See id.* at 706, 708, 710-11 (explaining that the Supreme Court had never "extended th[e] high degree of deference" applicable to the state secrets privilege "to a President's generalized interest in confidentiality" of his communications).  In fact, it is precisely because the privilege for "military or diplomatic secrets" is grounded in "areas of Art. II duties," which the Executive alone can exercise, that "courts have traditionally shown the utmost deference" to the Executive's discharge of these "Presidential responsibilities" regarding state secrets.  *Id.* at 710; *see also id.* at 710-11  (discussing *United States v. Reynolds*, 345 U.S. 1 (1953), as illustrative example).[12]

---

[12] **(U)** That deference reflects the constitutional foundation for the state secrets privilege and the practical realities of national security decisions under a constitutional regime of separated powers.  Because of the Executive Branch's particular sphere of constitutional responsibility, it alone has "the necessary expertise in protecting classified information" both to

(continued...)

(U) The constitutional foundation for the state secrets privilege is reflected in its place at the apogee "of the various privileges recognized in our courts." *See Halkin I*, 598 F.2d at 7;[13/] *see also, e.g.*, *El-Masri v. Tenet*, 2006 WL 1391390, at *3-7 ("Given the vitally important purposes it serves, it is clear that while the state secrets privilege is commonly referred to as 'evidentiary' in nature, it is in fact a privilege of the highest dignity and significance."). There is no doubt that the state secrets privilege is rooted in Article II and the separation of powers embodied in the Constitution.[14/]

### 2.    (U) Nothing in FISA Indicates Clear Congressional Intent to Preempt the Constitutionally Based State Secrets Privilege.

(U) Beyond its clear constitutional status, nothing in FISA demonstrates a clear intention on the part of Congress to abrogate the state secrets privilege. It is well-established that when Congress seeks to restrict or regulate the constitutionally-based powers of the Executive through legislation, it must make that intention clear. *See Swan v. Clinton,* 100 F.3d 973, 981 (D.C. Cir. 1996) (recognizing that there must be "affirmative evidence" that Congress intended to restrict Executive power); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (Congress must make a "clear

---

[12](...continued)
make the "[p]redictive judgment[s]" underlying a decision to invoke the state secret privilege and to determine "what constitutes an acceptable margin of error in assessing the potential risk." *See Egan*, 484 U.S. at 529.

[13] **(U)** *Cf. id.* at 14 n.9 (statement of Bazelon, J.) (noting that the "constitutional basis of the state secrets privilege" lies in "separation of powers" or "the President's Article II duties as Commander in Chief and his responsibility for the conduct of foreign affairs").

[14] **(U)** The Ninth Circuit's decision in *Kasza* is fully consistent with this view. The Court there concluded that nothing in the enactment of the Resource Conservation and Recovery Act suggested any "Congressional intent to replace the government's evidentiary privilege to withhold sensitive information in litigation," *Kasza*, 133 F.3d at 1167-68, and thus never had occasion to address whether Congress could, in fact, abrogate the state secrets privilege.

statement" in order to "restrict[] or regulat[e] presidential action," because "[l]egislation regulating presidential action . . . raises 'serious' practical, political, and constitutional questions") (citing *United States v. Bass*, 404 U.S. 336, 350 (1971)); *see also Public Citizen v. Dep't of Justice*, 491 U.S. 440, 466 (1989) ("[W]e are loath to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils."). As the Supreme Court has noted, "[i]n traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *Bass*, 404 U.S. at 350.

(U) Moreover, even if the state secrets privilege were an ordinary common law privilege, courts have repeatedly held that statutes will not be read to overcome the common law without a clear congressional expression of an intent to do so. As the Supreme Court has instructed, "[i]t is a well-established principle of statutory construction that '[t]he common law . . . ought not to be deemed repealed, unless the language of a statute be clear and explicit for this purpose.'" *Norfolk Redevelopment and Housing Authority v. Chesapeake and Potomac Telephone Co. of Norfolk*, 464 U.S. 30, 35-36 (1983) (citation omitted); *see also United States v. Texas*, 507 U.S. 529, 533 (1993) ("In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law.") (internal citations omitted).

(U) Nowhere in Section 1806(f) is there any indication, let alone a clear statement, that Congress had intended to restrict the applicability of the state secrets privilege in cases like this. The text of the statute, like the rest of FISA, contains no mention of the state secrets privilege, and

certainly no indication that Congress intended to limit it.  Indeed, we are aware of no discussion, or even mention, of the state secrets privilege in the legislative history of FISA—let alone an affirmative statement by Congress that it intended to restrict the Executive's authority to assert the privilege to protect foreign intelligence surveillance activities.  *See*, *e.g.,* H.R. Report No. 95-1273 (1978); H.R. Conf. Rep 95-1720 (1978); S. Rep. No. 95-701 (1978);  S. Rep. No. 95-604 (1977).[15/]

(U) Finally, Plaintiffs' reliance on *Halpern v. United States*, 258 F.2d 36 (2d Cir. 1958), for the proposition that a statute may waive the state secrets privilege is entirely without merit, as subsequent cases interpreting *Halpern* in the Second Circuit make clear.  *Halpern* involved the narrow question of whether the Invention Secrecy Act, 35 U.S.C. § 183 *et seq*., allowed a patent challenge to proceed notwithstanding the need to protect state secrets as to the use made by the government of a cryptographic encoding device.  As subsequent authority reveals, the circumstances at issue in *Halpern* were exceedingly narrow and did not recognize a waiver of the state secrets privilege under that Act.  In *Clift v. United States*, 597 F.2d 826, 829 (2d Cir.1979), the Second Circuit revisited *Halpern* and distinguished that case in finding that the state secrets privilege was not waived by the Inventions Secrecy Act.  The court in *Clift* found that, while the plaintiff in *Halpern* "knew his own invention . . . he did not know how extensively it was used, and these facts were state secrets."  *See id*.  In *Clift*, where the state secrets privilege was again asserted by the

_____

    [15] **(U)**  Plaintiffs assert that the "legislative history evinces congressional intent to supplant the state secrets privilege with FISA's statutory prescription for judicial oversight." Pls. Opp. at 8.  Their only support for this assertion is a statement in the legislative history that section 1806(f) "for security measures and protective orders *ensures adequate protection* of national security interests."  House Conf. Report No. 95-1720 at 31-32 (Oct. 5, 1978) (emphasis in original).  This statement hardly demonstrates a clear intent by Congress to abrogate the President's authority to assert the state secrets privilege in cases involving alleged surveillance.

Government in precisely the same factual setting involving a cryptographic device under the Invention Secrecy Act, the Second Circuit declined to follow *Halpern*. Indeed, the court specifically rejected the notion of *in camera* discovery because the plaintiff did not have a security clearance and, thus, could not obtain the results of any discovery. *See Clift*, 597 F.2d at 829. Instead, the Second Circuit simply deferred the case to see if future developments as to cryptographic devices might make it possible for the Government to produce some information under safeguards. *See id; see also American Tel. & Tel. Co. v. United States,* 4 Cl. Ct. 157, 160 (1983) (relying on *Clift* and rejecting assertion that the Invention Secrecy Act is a waiver of the state secrets privilege).

**(U)** In fact, a decade later, the information at issue in *Clift* was still subject to the state secrets privilege and, on remand, the district court upheld the state secrets assertion and dismissed the case. *See Clift v. United States,* 808 F. Supp. 101, 109-111 (D. Conn. 1991). The district court specifically found that, based on the Second Circuit's subsequent reading of *Halpern*, the Invention Secrecy Act should not be interpreted to waive the state secrets privilege, since this would "turn an absolute privilege into a qualified one, which is unsupported by precedent or statute." *Id.* at 110. The district court then held that, in cases where the plaintiffs did attempt to obtain access to government states secrets to which they were not entitled, the "sweeping waiver language of *Halpern*" did not apply. *Id.* Thus, *Halpern* is no authority at all for the proposition that a statutory provision in general, or the FISA in particular, waives an assertion of the state secrets privilege.[16]

---

[16] **(U)** It should be noted that any attempt to interpret FISA to preclude the Executive's ability to assert the state secrets privilege over matters possibly covered by FISA should be avoided, since doing so would raise extremely serious constitutional issues. *See Public Citizen*, 491 U.S. at 466 ("It has long been an axiom of statutory interpretation that 'where an otherwise

(continued...)

## III.    (U)  *HAMDAN v. RUMSFELD* DOES NOT SUPPORT PLAINTIFFS' POSITION.

(U) Plaintiffs next contend that the Supreme Court's recent decision in *Hamdan v. Rumsfeld*, __ U.S. ___, 2006 WL 1764793 (June 29, 2006) "foretells that Defendants will lose on the merits." Pls. Opp. at 20.  Plaintiffs' reading of *Hamdan* is wrong.  Indeed, Plaintiffs would apply *Hamdan* here without any regard for the distinct statutory and constitutional issues presented by this case. *Hamdan* did not even address, let alone resolve, a constitutional question concerning whether the President's authority may supersede the requirements of statutory law, and the Government did not put such a question at issue there.  *See Hamdan* at *21 n.23 (noting that the "Government does not argue" that the President may disregard limitations that Congress has, in the proper exercise of its own war powers, placed on his powers.").  Rather, *Hamdan* concerned a specific issue of statutory construction: was the use of a military commission to try Hamdan consistent with the requirements of the Uniform Code of Military Justice.[17/]

(U) The key context in which *Hamdan* was decided is that "the President . . . acted in a field with a history of Congressional participation and regulation."  *See Hamdan,* 2006 WL 1764793, at

---

[16](...continued)
acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress'") (quoting *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988))*; Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems.") (quoting *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001)).

[17] Hamdan is being held by the U.S. military at Guantanamo Bay, Cuba and was charged with conspiracy for participation as a member of al Qaeda to engage in terrorist activities.  *See id.* at *8-10.

*44 (Kennedy, J., concurring); *see also id.* at *19 (*Hamdan* concerns the "establishment and use of

penal tribunals" outside Congressional power under Article I, Sec. 8 of the Constitution to establish

Tribunals inferior to the Supreme Court).  The Court in *Hamdan* noted that Congress has express

textual authority under the Constitution to regulate military commissions.  Specifically, the

Constitution vests in Congress the power to "make rules concerning captures on land and water,"

*see Hamdan,* 2006 WL 1764793, at *20 (citing U.S. Const., *Art*. I, sec. 8, cl. 11, as well as the power

to "define and punish . . . offences against the laws of nations," *see id.* (citing U.S. Const., *Art* I, sec.

8. cl. 12).  Pursuant to these enumerated powers, Congress enacted provisions in the UCMJ that

placed conditions on the President's use of military commissions.  *See id.* at *32.

        **(U)** Article 36 of the UCMJ provides that the procedures of a military commission may be

prescribed by the President by regulations "which shall, so far as he considers practicable, apply the

principles of law and the rules of evidence generally recognized in the trial of criminal cases in the

United States district courts, but which may not be contrary to or inconsistent" with the UCMJ.  *See*

*Hamdan,* 2006 WL 1764793, at *34 (quoting Article 36 of the UCMJ).  At issue in that case were

commission procedures under which the accused might be excluded from the courtroom and denied

access to certain evidence.  *See id.*  The Court held that these procedures were not consistent with

courts-martial procedures, as required by the UCMJ, which afford the accused the right to be

present.  *See id.* at 36.  The Court also found that the commission procedures ran afoul of Article 21

of the UCMJ, which required compliance with the "law of war"— in this case with "Common

Article 3" of the Geneva Convention, which requires that the accused be tried by a "regularly

constituted court."  *See id.* at 37-40.  The Court again found that the "regular military courts"

contemplated by the Geneva Convention are the courts-martial established by Congressional statute. *See id.* at 41.

(U)  Plaintiffs' effort to apply the holding of *Hamdan* to this case is superficial at best.  They contend that, because the Foreign Intelligence Surveillance Act, like the UCMJ, is a statutory enactment, it necessarily regulates the President's inherent authority in this field.  As should be apparent, however, the issue of whether the President has intruded on a Congressional power, or whether Congress has intruded on a Presidential power, turns on the specific field and enumerated constitutional powers at issue and the particular facts of the case.  The mere existence of a statutory enactment in one area, based on clear Congressional power, cannot alone be dispositive of whether Congress can regulate in all areas without intruding on the President's power.

(U)  Unlike *Hamdan,* this case concerns the President's authority with respect to foreign intelligence surveillance, an area in which courts have long recognized inherent presidential authority both before and after the FISA was enacted.  *See In re Sealed Case*, 310 F.3d 717, 742 (Foreign Intel. Surv. Ct. of Rev. 2002) ("[A]ll the other courts to have decided the issue [have] held that the President did have inherent authority to conduct warrantless searches to obtain foreign intelligence information . . . . We take for granted that the President does have that authority and, assuming that is so, FISA could not encroach on the President's constitutional power"); *see also Truong*, 629 F.2d at 914 ("Just as the separation of powers in *Keith* forced the executive to recognize a judicial role when the President conducts domestic security surveillance, [citing 407 U.S. at 316-18], so the separation of powers requires us to acknowledge the principal responsibility of the President for foreign affairs and concomitantly for foreign intelligence surveillance."); *Butenko*, 494

F.2d at 603 (the President's authority to conduct foreign intelligence surveillance is implied from

his duty under Article II to conduct the nation's foreign affairs); *United States v. Brown,* 484 F.2d

at 426 (President's constitutional duty to act for the United States in the field of foreign relations,

and his inherent power to protect national security in the context of foreign affairs, supports his

authority to authorize warrantless wiretaps for the purpose of gathering foreign intelligence).

**(U)** Thus, unlike the long-standing history at issue in *Hamdan* of Congressional regulation

of military tribunals pursuant to enumerated Congressional powers that specifically govern the

power to "make rules concerning captures on land and water" and to "define and punish . . . offences

against the laws of nations," *see* Art I, sec. 8. Cls. 11, 12), this case presents the question of whether

Congress has intruded on the President's long-recognized authority to authorize foreign intelligence

collection.  Plaintiffs reliance on one particular application of law involving the political branch's

respective powers to resolve another case in a distinct field, involving different issues of law and

different facts, obviously paints with too broad a brush.

**(U)**  As outlined above, the facts as to why and how the President acted outside of the FISA

in establishing the TSP are essential to deciding the case.  Indeed, in *Hamdan* itself, the Court

observed that, under the UCMJ provisions at issue, the President could make a showing that it was

impracticable to apply procedures consistent with courts-martial to which "complete deference is

owed"—but no such showing was ventured in that case.  Here, of course, the very heart of

Defendants' position is that facts which cannot be revealed demonstrate why, in light of the exigent

threat at issue, compliance with the FISA in the context at issue here would not be practical and

would intrude on the President's duty to protect the nation from foreign attack.

**(U)** In addition, unlike the situation presented in *Hamdan,* the AUMF itself speaks directly to the actions taken by the President in this case than to the establishment of military commissions. Congress expressly acknowledged that the "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States."  AUMF, Pub. L. No. 107-40 §21(a), pmbl.  There can be no more direct way to "deter and prevent" acts of terrorism against the United States than to take steps to find al Qaeda agents through surveillance. The specific purpose of the TSP— to deter and prevent acts of terrorism against the United States— relates directly to the subject of the AUMF.[18]

## IV.    (U)    THE STATUTORY PRIVILEGES INVOKED IN THIS LITIGATION FURTHER PROTECT THE STATE SECRETS AT ISSUE IN THIS CASE.

**(U)** Plaintiffs' effort to diminish the statutory privileges invoked by the Director of National Intelligence and the Director of the National Security Agency to protect intelligence sources and methods by NSA is also unavailing.  The fact that statutory privilege claims arise typically in discovery contexts, *see* Pls. Opp. at 19, does not support an argument that these privileges do not support dismissal here where statutorily protected information is essential to resolving the claims on the merits.  Here, the Government has invoked two statutory protections for the information at issue, in addition to the state secrets privilege.  *See* Public Negroponte Decl. ¶ 10 (invoking 50 U.S.C. § 403-1(i)(1)); Public Declaration of Lieutenant General Keith B. Alexander, Director,

---

[18]  **(U)** Thus, the TSP is not only within the President's own inherent constitutional authority but within his authority under the AUMF as well.  Moreover, this statutory authorization is consistent with the terms of FISA as well, as Section 109 of the FISA creates an exception to criminal sanctions on any person who intentionally engages in electronic surveillance where such surveillance is authorized by statute.  *See* 50 U.S.C. § 1809(a)(1).

National Security Agency, ¶¶ 2, 6 (invoking Section 6 of the National Security Agency Act of 1959,

Pub. L. No. 86-36 (codified as a note to 50 U.S.C. § 402)).  The net result of all applicable privileges

is that information related to NSA activities and intelligence sources and methods must be protected

from disclosure.  *See Central Intelligence Agency v. Sims*, 471 U.S. 159, 168-69 (1985); *Fitzgibbon*

*v. Central Intelligence Agency*, 911 F.2d 755, 763 (D.C. Cir. 1990); *Linder v. National Security*

*Agency*, 94 F.3d 693, 696 (D.C. Cir. 1996).  As a result, information essential to the adjudication

of this case cannot be disclosed.[19]

## V.    (U) PLAINTIFFS' COUNSEL HAVE NO RIGHT OR ENTITLEMENT TO ACCESS CLASSIFIED INFORMATION IN THIS CASE.

**(U)** Finally, Plaintiffs' demand that they be given access to the classified, *ex parte, in camera*

information provided to this Court in support of the Government's privilege assertion, *see* Pls. Opp.

at 22-24, is quite plainly without merit.  Defendants have already shown generally that the Plaintiffs

have no right to access classified information.  *See* Defs.' Resp. to Pls.' Opp'n to Defs.' Lodging

of Classified Material Ex Parte and In Camera (May 12, 2006) [Docket No. 32].  In the context of

an assertion of the state secrets privilege, the law is well-settled that the Court itself  "should not

jeopardize the security which the privilege is meant to protect . . . ."  *See Reynolds*, 345 U.S. at 10.

Accordingly, courts have consistently rejected demands by plaintiffs in state secrets cases for access

to classified information.  The rationale for this rule is that "our nation's security is too important

---

[19] **(U)** Further, Plaintiffs cannot reasonably claim that the invocation of these statutory privileges is conclusory.  *See* Pls. Opp. at 18.  Because this information is privileged, Defendants have necessarily presented this information to the Court *ex parte* and *in camera*.  *See Founding Church of Scientology v. National Security Agency*, 610 F.2d 824, 833 (D.C. Cir. 1979) (finding public affidavit "far too conclusory" but suggesting that NSA remedy this through submission of, *inter alia*, an *ex parte* and *in camera* classified affidavit).

PAGE 31   –   DEFENDANTS' REPLY IN SUPPORT
                    OF MOTION TO DISMISS/SUMMARY JUDGMENT

to be entrusted to the good faith and circumspection of a litigant's lawyer . . . or to the coercive power of a protective order." *Ellsberg v. Mitchell*, 709 F.2d 51, 61 (D.C. Cir. 1983) (rule denying private counsel access to classified information is "well settled"); *see also Weberman v. National Security Agency,* 668 F.2d 676, 678 (2d Cir. 1982) (risk presented by giving private counsel access to classified information outweighs benefit of adversarial proceedings); *Jabara v. Kelly*, 75 F.R.D. at 486 ("plaintiff and his legal representative should be denied access to classified in camera exhibits in support of the (privilege) claims").

**(U)** Moreover, there is no due process concern with the submission of classified information to the court *ex parte, in camera* in a state secrets privilege context, and Plaintiffs cite no authority to the contrary.  Indeed, courts routinely examine classified information on an *in camera, ex parte* basis in state secrets privilege cases, and on the basis of that examination, make determinations on the state secrets privilege that can affect or even dictate the outcome of a case.  *See, e.g., Sterling v. Tenet,* 416 F.3d 338, 342 (4th Cir. 2005) (upholding dismissal based on determination, after reviewing *in camera* affidavits, that any attempt by plaintiffs to make out a *prima facie* case at trial would entail the revelation of state secrets), *cert. denied*, 126 S. Ct. 1052 (2006); *Kasza*, 133 F.3d at 1170 (same); *Salisbury v. United States*, 690 F.2d 966, 974-77 (D.C. Cir. 1982).

**(U)** "[N]o governmental interest is more compelling than the security of the nation," *Haig v. Agee*, 453 U.S. 280, 307 (1981), and "that strong interest of the government clearly affects the nature . . . of the due process which must be afforded," *see National Council of Resistance of Iran v. Dep't of State* (*"NCRI"*), 251 F.3d 192, 207 (D.C. Cir. 2001).  The submission of classified information, *ex parte, in camera* may very well be needed by a court to decide a privilege claim, but

due process does not require that the information to be protected be shared with the opposing litigant—indeed, that would negate the very purpose of seeking a privilege claim. *See Jabara v. Kelly*, 75 F.R.D. at 486 (court must determine state secrets assertion without revealing the content of the privileged materials). While "[d]isclosures *in camera* are inconsistent with the normal rights of a plaintiff of inquiry and cross-examination, . . . if the two interests cannot be reconciled, the interest of the individual litigant must give way to the government's privilege against disclosure of its secrets of state." *Id.*

**(U)** Here, the Court should bear in mind that the Plaintiffs are associated with an organization that the United States has designated as a Specially Designated Global Terrorist and, thus, the disclosure of classified information about intelligence sources and methods to these Plaintiffs raises particularly sensitive concerns. Defendants shared state secrets with the Court so that it may decide a privilege claim and whether this case can proceed. The law is clear that the Government's decision to do so does not enable Plaintiffs to have access this information as well. The Government has not granted access by Plaintiffs to this information, and the decision to do so rests within the discretion of the United States. *See Dept. of the Navy v. Egan,* 484 U.S. at 527.[20]

---

[20] **(U)** Two cases cited by Plaintiffs for the proposition that they have a due process right of access to the classified information submitted here are plainly inapposite, as they involve an *ex parte* determination of a tax dispute, not access to state secrets. *See* Pl.s Opp. at 23 (citing *Guenther v. Comm'r of Internal Revenue*, 889 F.2d 882, 884 (9th Cir. 1989); *Guenther v. Comm'r of Internal Revenue*, 939 F.2d 758, 761 (9th Cir. 1991)). *Hamdan v. Rumsfeld* also does not support for Plaintiffs' entitlement to access *in camera* classified materials submitted in support of the state secrets privilege. That case concerned whether an individual facing military commission proceedings for alleged terrorist activities may be denied access to the evidence of his guilt of a crime. No comparable circumstance exists here and, in any event, the Court did not rule in *Hamdan* that even terrorist suspects facing a military tribunal are entitled to access

(continued...)

<u>CONCLUSION</u>

**(U)**      For the foregoing reasons, and those set forth in Defendants prior submissions, including those for *ex parte, in camera* review, the United States' assertion of the state secrets privilege should be upheld and the Defendants' Motion to Dismiss or for Summary Judgment should be granted.

Dated:  July 25, 2006                              Respectfully submitted,

                                                   PETER D. KEISLER
                                                   Assistant Attorney General

                                                   CARL J. NICHOLS
                                                   Deputy Assistant Attorney General

                                                   JOSEPH H. HUNT
                                                   Director, Federal Programs Branch

                                                   ___*s/ Anthony J. Coppolino*_____
                                                   ANTHONY J. COPPOLINO
                                                   Special Litigation Counsel
                                                   United States Department of Justice
                                                   Civil Division, Federal Programs Branch
                                                   20 Massachusetts Avenue, N.W.  Room 6102
                                                   Washington, D.C. 20001
                                                   Telephone:     (202) 514-4782
                                                   Fax:            (202) 616-8460
                                                   tony.coppolino@usdoj.gov

                                                   ___*s/ Andrea Gacki*_____
                                                   ANDREA GACKI
                                                   Trial Attorneys, U.S. Department of Justice
                                                   Civil Division, Federal Programs Branch
                                                   20 Massachusetts Avenue, N.W., Room 7334
                                                   Washington, D.C. 20001

_____

[20](...continued)
classified information.

PAGE 34   –   DEFENDANTS' REPLY IN SUPPORT
                    OF MOTION TO DISMISS/SUMMARY JUDGMENT

Telephone:     (202) 514-4336
Fax:             (202) 318-2461
andrea.gacki@usdoj.gov

ANDREW H. TANNENBAUM
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.  Room 7332
Washington, D.C. 20001
Telephone:  (202) 514-4263
Fax:          (202) 616-8202
andrew.tannenbaum@usdoj.gov
*Attorneys for the United States of America*

PAGE 35  –    DEFENDANTS' REPLY IN SUPPORT
                OF MOTION TO DISMISS/SUMMARY JUDGMENT